627 S.E.2d 765

**CHARLESTON COUNTY DEPARTMENT
OF SOCIAL SERVICES, Respondent,**

v.

**Priscilla JACKSON, Bryan Houpe, Lamont Coles, Sr., John Doe
and Stephen Doe representing the unknown biological father or
fathers of Jazmyn Jackson and Lamont Coles, Defendants,**

and

**Jazmyn Jackson, a child, d/o/b 6/26/90, Lamont Coles, a child,
10/15/95, of whom Lamont Coles, Sr. is, Appellant.**

No. 4090.

Court of Appeals of South Carolina.

Heard Jan. 18, 2006.
Decided March 6, 2006.

Cherie W Blackburn, Stephanie E. Lewis and Susan S. Quist, all of Charleston, for Appellant.

Frampton Durban, Jr., of North Charleston, for Respondent.

James C. Bradley and Michael F. Bowler, III, both of Charleston, for Guardian Ad Litem.

HEARN, C.J.:

The Charleston County Department of Social Services (the Department) brought this termination of parental rights (TPR) action against Lamont Coles, Sr. (Father). The family court terminated Father's parental rights to Lamont Coles, Jr. (Child), and Father appeals. We reverse.

## FACTS

The origins of this case began more than ten years ago, in February of 1995, when Father met Priscilla Jackson (Mother) in Long Island, New York. At that time, Mother had a four-year-old daughter named Jazmyn. In June 1995, Father was arrested for first-degree assault and robbery. After pleading guilty, he was imprisoned, and has been incarcerated in a New York State prison ever since. He is not eligible for parole until 2007.[1]

Three months after Father's arrest in 1995, Mother gave birth to Child. Shortly thereafter, Father affirmatively sought to establish paternity of Child, and in May 1996, a New York family court determined Father was Child's biological father. A month after this determination, Father tried to send Child his limited inmate earnings. He also attempted to arrange a life insurance policy that benefited Child. His attempts were in vain, however, because in November 1996, Mother, Jazmyn, and Child disappeared.[2]

From that moment onward, Father engaged in an exhaustive letter-writing campaign to learn the whereabouts of Child. Father wrote hundreds of letters to numerous agencies, associations, centers, organizations, and government officials. Father's effort was so intense, the Department's counsel stipulated at trial that Father "has done more than anybody I've ever seen to try to find his son and to maintain contact with the agencies that had his son." The family court took judicial notice of the fact that Father "did everything, most probably more than anyone would ever expect anyone to ever do in the history of this court" to locate his son.

---

1. Father was also eligible for parole in July 2005, but at the time of oral argument in January of 2006, Father was still incarcerated.

2. Apparently, the trio moved to South Carolina without telling Father.

While trying to locate his son, Father expressed concern about losing his parental rights. In May 1997, for example, he wrote a New York family court to ask for assistance of counsel to protect his legal rights in the event his legal connection with Child was in jeopardy because of his inability to locate Child. Father wrote that same court almost a year later to notify it that despite his best efforts he could not locate Child. He told the family court he had contacted multiple investigators, non-profit corporations, bar associations, as well as the Ohio Departments of Social Security and Vital Statistics, which he contacted because Mother was from Ohio.

Meanwhile, in South Carolina, Mother and Child's life together was unraveling. In August 1997, the Department took Child into emergency protective custody based on allegations Mother's boyfriend sexually abused Jazmyn. In September 1997, the family court found this abuse constituted a threat of harm to Child. The family court issued a restraining order against Mother's boyfriend and approved a treatment plan requiring Mother to attend individual counseling, parent effectiveness training classes, and a substance abuse treatment program. It is unclear from the record what efforts, if any, the Department made to notify or contact Father.

In January 1998, the family court ordered Mother to establish and maintain stable housing and an appropriate income to support her children. Again, the Department's efforts to notify or contact Father were either non-existent or are unknown. In February 1999, Mother disappeared,[3] and during her absence, the family court established a permanent plan of TPR and adoption. This action occurred in July 1999, and once again, Father was never notified, though he was still doing everything he could to locate Child.

In February 2000, Father learned from the National Missing Children's Locate Center in Portland, Oregon that Mother resided in South Carolina. He immediately wrote Mother, but his letter was returned with an indication that she had moved. Father then began writing South Carolina agencies, courts, and legal services. Finally, on August 22, 2000, culminating nearly four years of searching, the South Carolina Department of Social Services wrote Father, informing him Child

---

3. The Department did not locate her until September 2001.

was in foster care in the custody of the Department. The Department also advised him it could not proceed with his case until after his release from prison.

Within days, on August 28, 2000, Father began to write the Department. Although he did not receive a response from his initial letters, he soon discovered Sue Christopher was Child's caseworker, and he began writing to her on October 9, 2000.[4] In this letter, Father apprised the Department of his extensive search to find Child and his wish to establish "a positive line of communication" with the Department. He also notified the Department he did not want his parental rights terminated, he needed legal representation, and he had a five-year-old file of correspondence the Department could review. Despite the fact that Father had been searching for information about Child for four years, the Department did not respond.

On October 23, 2000, Father again wrote the Department. Father expressed his wish to connect with Child and asked the Department about his options. The Department sent him a required form letter inviting him to a Foster Care Review Board (the Board) meeting, but did not otherwise respond. On October 30, 2000, Father informed the Department he had received the Board invitation but could not attend because he was incarcerated in New York. He also expressed his frustration that he had not received any information from the Department other than the invitation, and that he felt as though the Department was discouraging him from making contact with Child. The Department did not respond.

On November 1, 2000, Father again wrote the Department. This time, he asked for Child's address so he could write Child. He also reiterated he did not want his parental rights terminated. On the same day, Father wrote the Department's legal counsel with the same request. Neither the Department nor the Department's legal counsel responded. On November 29, 2000, Father again wrote the Department. He alerted the Department it had not responded to any of his letters, and he wanted to know his options as well as the results of the Board meeting. The Department did not respond. On January 4, 2001, Father again wrote the Department. He expressed his

---

4. This is the first time the Department acknowledges contact with Father.

utter distress that the Department had not responded to any of his letters.

Finally, on January 9, 2001, the Department responded to Father. Department caseworker Christopher informed Father of the July 1999 permanence planning order directing TPR and adoption, and assured him the Department would ask the court to appoint him a Guardian ad Litem (GAL) and legal counsel to protect his rights. On January 10, 2001, Department director Odessa Williams informed Father the Department had not yet commenced a TPR action against him and requested that Father furnish the Department with a list of "adoptive resources" for Child. This January 2001 communication is the first time the Department responded to Father's letters, which began in October 2000, and the first time it contacted him since it took Child into emergency protective custody in August 1997.

On February 5, 2001, Father asked the Department multiple questions, including whether he could contact Child. He received no reply, so Father wrote three additional letters on March 8, March 19, and April 16. In these letters, he asked the Department to answer his inquiries and also requested a photograph of his son. The Department did not reply to any of these letters.

On August 6, 2001, Father wrote Department caseworker Christopher the following:

> I believe [the Department] is supposed to unify families with problems, help them. My son has been in foster care since [August 1997]. [To] this date I think that [is] over four years ... What can be done so I don't have to lose [or] give up my parental rights and forever lose my only child[?] Can you, being the head of my son's case, the *only* one who can provide answers, can you give me his social security number [so] at least if I die I can give [or] leave him something[?]

Christopher did not respond to this letter. On August 8, 2001, the Department filed a TPR action against Father. This action was taken twenty-five months after the family court's July 1999 order establishing a permanent plan of TPR and adoption and approximately twelve months after Father learned Child's whereabouts.

After multiple continuances, this case was tried on July 17, 2003; December 11, 2003; and June 16 and 17, 2004. On August 27, 2004, the family court terminated Father's parental rights to Child. The court found Father willfully failed to visit and support Child because it took Father "over a year and a half to provide the identity of the persons who could assume some of his parental duties." The court referred to the fact that Father did not provide the names of adoptive resources that Department director Williams requested in January 2001 until July 2002. The court also found Child had been in foster care for fifteen out of the last twenty-two months. Finally, the family court found TPR would be in the best interest of Child, noting Child's GAL recommended it. Father appealed this order.

## STANDARD OF REVIEW

In a TPR case, the best interest of the child is the paramount consideration. *Doe v. Baby Boy Roe*, 353 S.C. 576, 579, 578 S.E.2d 733, 735 (Ct.App.2003). Before parental rights can be forever terminated, the alleged grounds for the termination must be proven by clear and convincing evidence. *Richberg v. Dawson*, 278 S.C. 356, 357, 296 S.E.2d 338, 339 (1982); *S.C. Dep't of Soc. Servs. v. Parker*, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct.App.1999). On appeal, this court may review the record and make its own determination whether the grounds for termination are supported by clear and convincing evidence. *S.C. Dep't of Soc. Servs. v. Cummings*, 345 S.C. 288, 293, 547 S.E.2d 506, 509 (Ct.App.2001). Despite this broad scope of review, however, we should not necessarily disregard the findings of the family court because the family court is in a better position to evaluate the credibility of the witnesses and assign weight to their testimony. *Dorchester County Dep't of Soc. Servs. v. Miller*, 324 S.C. 445, 452, 477 S.E.2d 476, 480 (Ct.App.1996).

## LAW/ANALYSIS

Father argues the family court erred in terminating his parental rights because (1) Father did not willfully fail to visit or support Child; (2) under the circumstances, Child's presence in foster care for fifteen of the most recent twenty-two

months alone is not sufficient to support TPR; (3) TPR is not in the best interest of Child; and (4) TPR violated Father's right to due process under the Fourteenth Amendment to the United States Constitution. We agree that Father did not willfully fail to visit or support child, and find that termination of Father's rights is not in Child's best interest.

■ Under the United States Constitution, natural parents are entitled to fundamentally fair procedures when the State seeks to sever the relationship they have with their child. U.S. Const. amend. XIV, § 1.; *Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In *Santosky*, the United States Supreme Court announced:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life..... When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

455 U.S. at 753, 102 S.Ct. 1388. The *Santosky* Court also noted that at the fact-finding stage, "the State cannot presume that a child and his parents are adversaries" because "the child and his parents share a vital interest in preventing erroneous termination of their natural relationship" until the State proves parental unfitness. *Id.* at 761, 102 S.Ct. 1388.

In South Carolina, the procedures for TPR are governed by statute. *See* S.C.Code Ann. §§ 20–7–1560 to –1582 (Supp.2005). The purpose of the TPR statute is:

> [T]o establish procedures for the reasonable and compassionate termination of parental rights where children are abused, neglected, or abandoned in order to protect the health and welfare of these children and make them eligible for adoption by persons who will provide a suitable home environment and the love and care necessary for a happy, healthful, and productive life.

S.C.Code Ann. § 20–7–1560 (Supp.2005). The TPR statute "must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the custody and

control of their parents by terminating the parent-child relationship." S.C.Code Ann. § 20–7–1578 (Supp.2005); *Joiner v. Rivas,* 342 S.C. 102, 108, 536 S.E.2d 372, 375 (2000). The family court may order TPR if it makes the twofold finding that plaintiff has proved by clear and convincing evidence the existence of at least one statutory ground enumerated in section 20–7–1572 and TPR would be in the best interest of the child. S.C.Code Ann. § 20–7–1572 (Supp.2005).

## I. Failure to Visit or Support Child

■ Father argues the family court erred in finding he willfully failed to visit or support Child. We agree.

■ The family court can terminate parental rights when TPR is in the best interest of the child and the "child has lived outside the home of either parent for a period of six months," and during that time the parent has either "wilfully failed to visit the child" or "wilfully failed to support the child." S.C.Code Ann. § 20–7–1572(3) and (4) (Supp.2005). Willful conduct is conduct that "evinces a settled purpose to forego parental duties ... because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent." *S.C. Dep't of Soc. Servs. v. Broome,* 307 S.C. 48, 53, 413 S.E.2d 835, 838 (1992). Whether a parent has willfully failed to visit or support his or her child is a "question of intent to be determined from the facts and circumstances of each individual case." *S.C. Dep't of Soc. Servs. v. Headden,* 354 S.C. 602, 610, 582 S.E.2d 419, 423 (2003); *Stinecipher v. Ballington,* 366 S.C. 92, 98, 620 S.E.2d 93, 96 (Ct.App.2005). The family court has wide discretion to make this determination, but the element of willfulness must be established by clear and convincing evidence. *Broome,* 307 S.C. at 52, 413 S.E.2d at 838. "The court may consider all relevant circumstances in determining whether or not the parent has wilfully failed to support the child, including ... the ability of the parent to provide support." S.C.Code Ann. § 20–7–1572.

■ Incarceration alone is insufficient to justify TPR. *S.C. Dep't of Soc. Servs. v. Wilson,* 344 S.C. 332, 337, 543 S.E.2d 580, 583 (Ct.App.2001). In *Wilson,* the father was incarcerated after the birth of his three children. Two years after his

incarceration, the Department took his children into emergency protective custody. A year later, the Department brought a TPR action against the father for willful failure to visit his children. The family court ordered TPR, even though the father requested an opportunity to visit his children at each review hearing. We reversed the family court, holding that "[t]erminating the parental rights of an incarcerated parent requires consideration of all of the surrounding facts and circumstances in the determination of wilfulness." *Id.* at 340, 543 S.E.2d at 584. We noted the record was replete with evidence of not only the father's repeated requests to the Department to visit his children, but also the Department's active role in thwarting the father's attempts to visit his children. *Id.* at 338, 543 S.E.2d at 583.[5]

In this case, the record demonstrates the Department's blatant indifference to Father's plight. The Department took Child into emergency custody in August 1997. The Department should have contacted Father at this time. Instead, it appears the Department conducted the case as if Father did not exist. In September 1997, the Department recommended, and the family court adopted, a treatment plan requiring Mother to attend individual counseling, parent effectiveness training classes, and a substance abuse treatment program. The Department did not recommend a treatment plan for Father even though, by Department caseworker Christopher's own admission, one could have been recommended. When Mother eventually failed to complete her treatment plan, the family court established a permanent plan of TPR and adoption. Again, the Department did not contact Father, even though he risked losing his parental rights to Child.

---

**5.** Compare *Wilson* to *South Carolina Department of Social Services v. Ledford,* 357 S.C. 371, 376, 593 S.E.2d 175, 177 (Ct.App.2004), where we upheld the essential holding of *Wilson* that incarceration alone is insufficient to justify TPR. In *Ledford,* the father was incarcerated in Georgia. He only attempted to contact his child twice, and was unsuccessful on both occasions. After a SCDSS caseworker found him via an internet search of the Georgia Department of Corrections, the father made no effort to contact the caseworker or any other SCDSS employee. After SCDSS brought a TPR action against the father, he still made no effort to contact SCDSS. The family court terminated his parental rights and we affirmed.

For reasons even the Department was unable to explain, the Department took more than two years to file a complaint seeking to terminate Father's parental rights to Child. During this interim, Father discovered, after four years of searching, that the Department had custody of Child. On October 9, 2000, he wrote Christopher a letter explaining his circumstances and hoping to establish a "positive line of communication" with the Department. Thus, it took the Department over three years to make contact with Father, and even then, the communication occurred only because Father contacted the Department as a result of his extraordinary efforts to locate Child. It then took Christopher three months to respond. Father continued to write. He indicated he wanted to communicate with Child; he asked for Child's picture, address, and social security number. He also asked to visit, or at the very least, to write Child. Despite Father's multiple requests, Christopher did not respond until seven months later, on March 18, 2002.[6] By the time Father received this letter, the Department had already brought a TPR action against him.

Christopher did not assist in connecting Child with his natural father. She did not provide Father with any information that would help him communicate with Child, nor did she send him a picture of Child as Father requested. At trial, Christopher testified she could not provide Father with the information he requested because a Department-hired therapist, Karen Tarpey, recommended Child not communicate with Father because it would not be in Child's best interest.[7] However, Christopher never told Father this was the reason she continued to deny him access to any information regarding contact with Child. Instead, she simply did not respond to him.

Even assuming Christopher had told Father about Tarpey's recommendation, there is not much Father could have done

---

6. This is only the second response Father received from Christopher, his son's caseworker at the Department, since his initial letter of October 9, 2000.

7. Karen Tarpey is a licensed independent social worker, with a master's degree in social work, who accepts referrals from the Department. There is no indication in the record that Ms. Tarpey ever contacted Father prior to making this recommendation.

about it. The fact remained Father could not communicate with Child because the Department would not allow him to contact Child. Therefore, even if Father had been provided an address to write Child letters, or send him birthday cards, Child would not have received them. The Department would not have allowed Father's correspondence to reach Child because Tarpey opined Child's exposure to Father would be detrimental.

■ The Department can certainly rely on the opinion of a therapeutic expert in determining what is in the best interest of a child in its custody; however, if the expert recommends the child not have parental contact without even contacting the parent herself, it is disingenuous for the Department to initiate a TPR action against the parent for not contacting child. Consequently, even assuming therapist Tarpey's recommendation is correct, the mere fact that it may be detrimental to Child for Father to contact Child does not mean Father's parental rights should be automatically terminated.

Based on the record, we find the Department did not demonstrate Father was so indifferent to the right of Child to receive his support and consortium that Father willfully failed to visit and support him. To the contrary, the record reflects Father actively sought to visit and support Child, and, if anything, was prevented from exercising his parental duties because the Department was indifferent to his parental rights. Father could not communicate with Child, let alone visit him, because the Department forbade him from doing so based on Tarpey's recommendation. Father was not able to send money to Child despite his attempts to do so because the Department never provided him with an address of where to send a check.

■ The family court emphasized the fact that after Father received a response from the Department in January 2001, he did not furnish a list of adoptive resources until July 2002. To the extent such a list is relevant, let alone dispositive, in determining whether Father's parental rights should be terminated, we find Father's delay in providing the Department with a list of adoptive resources does not show a settled purpose to forego his parental duties. Because Father grew up in foster care, he recommended his foster mother and

foster sister as adoptive resources. Although his foster mother testified she was no longer interested in adopting Child, his foster sister said she was still interested. This recommendation, while not perfect, was nevertheless viable. Moreover, if the Department had made an effort to contact Father when it initially took Child into emergency protective custody in August 1997, Father would have had more options than he does now. In 1997, for example, Father's foster mother, biological father, and biological brother were all possibilities. As Father testified at trial, with the passing years, "a lot of things started happening that no one [could] control." Finally, the mere fact that Father was unable to find a suitable adoptive resource, does not necessarily mean Father willfully failed to visit or support Child.

After considering all relevant facts and circumstances, we hold the Department did not establish by clear and convincing evidence that Father willfully failed to visit or support Child. Accordingly, the family court erred in terminating Father's parental rights based on his willful failure to visit and support Child.

## II. Child in Foster Care

Father argues that, under the circumstances, Child's presence in foster care for fifteen of the most recent twenty-two months alone is not sufficient to support TPR. We disagree.

The family court can terminate parental rights when it is in the best interest of the child and the "child has been in foster care under the responsibility of the State for fifteen of the most recent twenty-two months." S.C.Code Ann. § 20–7–1572(8). "A finding pursuant to section 20–7–1572(8) alone is sufficient to support a termination of parental rights." *S.C. Dep't of Soc. Servs. v. Sims*, 359 S.C. 601, 608, 598 S.E.2d 303, 307 (Ct.App.2004); *see also Doe v. Baby Boy Roe*, 353 S.C. 576, 581, 578 S.E.2d 733, 736 (Ct.App.2003).

Father points out that he had only been made aware of Child's presence in foster care twelve months prior to the filing of the TPR action. However, the purpose of the statutory ground allowing for termination if a child has been in foster care for fifteen of the last twenty-two months is to ensure children do not languish in foster care when termi-

nation of parental rights would be in their best interests. *Doe,* 353 S.C. at 581, 578 S.E.2d at 736 ("TPR statutes must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the custody and control of their parents by terminating the parent-child relationship."). Thus, it is the child's perspective, and not the parent's, that we are concerned with when determining whether this statutory ground has been met. Here, the letter of the law was met once Child resided in foster care for fifteen of the last twenty-two months regardless of Father's knowledge of Child's whereabouts.[8]

### III. Best Interest of Child

 Father argues TPR is not in Child's best interest. We agree.

In TPR cases, the best interest of the child is the paramount consideration. *S.C. Dep't of Soc. Servs. v. Vanderhorst,* 287 S.C. 554, 561, 340 S.E.2d 149, 153 (1986). "The interests of the child shall prevail if the child's interest and the parental rights conflict." S.C.Code Ann. § 20–7–1578 (Supp.2005).

Child currently resides in a therapeutic foster home with his sister Jazmyn. Both children have special needs. Child has some learning disabilities. Because the two children support each other, all parties, including Father, agree they should remain together.[9] However, there is no assurance the children will remain together, or even at the same foster home. Child's current foster parents wish to remain as foster parents and, as of the TPR hearing, have not expressed an interest in

---

8. We note that although the letter of the law was met in this particular case, especially considering Father's incarceration will continue to necessitate foster care for Child, there may be some instances where this statutory ground would not support termination of parental rights despite the passage of a fifteen month stay in foster care. *See S.C. Dep't of Soc. Servs. v. Cochran,* 356 S.C. 413, 420, 589 S.E.2d 753, 756 (2003) (Pleicones, J., concurring) ("I am not willing to sever the parent-child relationship solely on the basis that the child has spent fifteen of twenty-two months in foster care where the appellant presented substantial evidence that much of the delay in the processing of this case is attributable to the acts of others.").

9. The two children were not placed together in the same foster home until three years after the Department obtained custody of them.

adopting him. Thus, terminating Father's parental rights will not ensure future stability for Child. Moreover, keeping Father's parental rights intact will not disrupt Child's current living situation. Father does not gain custody of Child simply because the Department failed to terminate his parental rights at this time. Rather, by not terminating Father's parental rights, Father merely maintains his right to connect with Child as well as his obligation to support Child, emotionally, financially, or otherwise. The Department should, in the best interest of Child, facilitate this connection and accompanying obligation.

The family court noted that Child's guardian ad litem, William Jordan, recommended TPR would be in the best interest of Child. However, Jordan testified that he did not know if Child would be harmed by contact with Father. Jordan could not opine on the matter because he never spoke with Father and never talked to Child about Father. Jordan also admitted he never responded to any of Father's correspondence, but said he let his counsel know about it. Accordingly, Child's GAL recommended terminating Father's parental rights without talking to Child about Father's existence and without talking to Father at all.[10] Under these circumstances, we do not understand how Child's GAL can recommend TPR without any investigation into the situation between Child and his natural father.[11]

Father's tireless efforts to connect with Child demonstrate a sincere concern for Child's well-being. Again, when Father learned of Child's birth, he immediately established paternity. When Child disappeared, Father wrote hundreds of letters to try to locate Child. After Father found Child, he wrote hundreds more to try to contact him, or even just to have a

---

10. Jordan submitted his report on July 16, 2003. Accordingly, pursuant to section 20-7-1549 of the South Carolina Code (Supp.2005), which became effective on January 15, 2003, Jordan had a duty and obligation to conduct an "independent, balanced, and impartial investigation to determine the facts relevant to the situation of the child and the family," including a mandatory interview of Child's parents. *See* S.C.Code Ann. § 20-7-1549(A)(2)(iv).

11. We also do not understand how Child's therapist, Karen Tarpey, can recommend Father not contact Child without ever talking to Child about Father, and without talking to Father at all.

photograph of him. In addition to expressing a desire to emotionally support Child, Father's letters expressed a desire to financially support Child with what little resources Father had. As the Department stipulated, Father "has done more than anybody [the Department's attorney had] ever seen to try to find his son and to maintain contact with the agencies that had his son." Unless long-term incarceration alone is enough to terminate parental rights, which is not the case in South Carolina,[12] we cannot discern any evidence from the record before us indicating termination would be in Child's best interests. Child's foster parents are not willing to adopt him, Father's efforts to maintain a relationship with Child have been extraordinary, and the social worker who advised against communication between Father and Child had neither spoken with Father nor spoken to Child about Father.

▮ Father's connection with Child may be faint, but it is nevertheless existent. It is also a fundamental liberty interest protected by the United States Constitution. *Santosky*, 455 U.S. at 753, 102 S.Ct. 1388. Such an interest cannot be severed where, as here, the Department failed to present any reason why termination of parental rights would be in Child's best interest. Accordingly, the family court erred in terminating Father's parental rights.

### IV. Due Process Violation

▮ Father argues TPR violates his right to due process under the Fourteenth Amendment to the United States Con-

---

12. If the South Carolina General Assembly intended long-term incarceration alone to justify termination of parental rights, it would have made such a provision in the statute. In many states, incarceration is a ground for termination, though even then, the best interests of the child are considered. *See, e.g.,* Ala.Code § 26–18–7; Alaska Stat. § 47.10.080; Ariz.Rev.Stat. § 8–533(B)(4); Ark.Code Ann. § 9–27–341(3)(B)(viii); Cal. Welf. & Inst.Code § 361(b)(12); Colo.Rev.Stat. § 19–3–604(1)(b)(III); Del.Code Ann. tit. 13 § 1103; Fla. Stat. Ann. § 39.806; Ga.Code. Ann. § 15–11–94(4)(b)(iii); Idaho Code § 16–2005(1)(e); 750 Ill. Comp. Stat. 50/1(D)(r); Kan. Stat. Ann. § 38–1583(b)(5); La. Children's Code Ann. art. 1015(6); Mich. Comp. Laws § 712A.19b(3)(h); Mont.Code Ann. § 41–3–609(2)(d); N.H.Rev.Stat. Ann. § 170–C:5(VI); Ohio Rev.Code Ann. § 2151.414(E)(12); Okla. Stat. tit. 10 § 7006–1.1(A)(12); Or.Rev.Stat. § 419B.504(6); R.I. Gen. Laws § 15–7–7(a)(2)(i); S.D. Codified Law § 26–8A–26.1(4); Tenn. Code Ann. § 36–1–113(g)(6); Tex. Fam.Code Ann. § 161.001(Q); Utah Code Ann. § 78–3a–408(2)(e); Wyo. Stat. Ann. § 14–2–309(a)(iv).

stitution. However, this issue was not raised to or ruled upon by the family court, and therefore it is not preserved for review. *Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review."); *Jones v. Daley*, 363 S.C. 310, 315, 609 S.E.2d 597, 599 (Ct.App.2005).

## CONCLUSION

Based on the foregoing reasoning, the family court order terminating Father's parental rights is

**REVERSED.**

ANDERSON and KITTREDGE, JJ., concur.