THIS OPINION
 HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN
 ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 John and Jane Doe, Johnny
 and Janie Roe, and Jonathan and Janet Moe, Respondents,
 v.
 Mother and Father, Defendants,
 Of Whom Father is the Appellant.
 In the interest of three minor children.  
 
 
 

Appeal From Greenville County
Timothy H. Pogue, Family Court Judge
Unpublished Opinion No.  2009-UP-397
Heard June 24, 2009  Filed July 29, 2009
REVERSED IN PART, VACATED IN PART, AND
 REMANDED

 
 
 
 Elizabeth Burns Robertson, of Greenville, for Appellant. 
 Chace Damon Campbell and Robert Clark, both of Greenville, for
 Respondents.
 Amanda Craven, of Spartanburg, Guardian ad Litem for Children.  
 
 
 
 

PER CURIAM:  Father contends the family court erred
 in terminating his parental rights and, thereafter, in granting the petition of
 the Does, the Roes, and the Moes (Respondents) to adopt his three minor
 children (Children).  We reverse the termination of Father's parental rights,
 vacate the adoption, and remand to the family court for a custody determination.  
FACTS
Father and Mother
 married in April 1998.  They have three children: J.B., currently age nine;
 N.B., currently age seven; and A.B., currently age four.  In November 2003, while
 the family was living in North Carolina, Father was arrested and incarcerated for
 committing statutory rape a year earlier.  In May 2004, Father was convicted
 and sentenced to serve fifteen years and two months in prison.    
Subsequently, Mother
 and Children moved to South Carolina.  In approximately December 2004, the
 South Carolina Department of Social Services (DSS) intervened and placed
 Children with their maternal grandparents.  On March 15, 2005, the family court
 conducted a hearing on the merits of removing Children from Mother.  Mother
 attended the hearing, but Father did not.  According to the family court's
 order, Father was "incarcerated in North Carolina and could not be
 transported."  The family court found Mother's medical and physical
 neglect of Children constituted harm justifying their removal from her, and it adopted
 a placement plan submitted by DSS.  The placement plan's "findings of harm
 justifying removal and intervention" and treatment goals related to
 "removal conditions" concerned only Mother.  On the other hand, findings
 "justifying intervention," and goals related to those findings,
 concerned Mother and Father.  The family court ordered Mother to complete an
 extensive placement plan and to pay child support.  Grandparents received temporary
 legal and physical custody of Children.  In addition, the placement plan
 required Father to have "no contact, direct or indirect, with [Children]
 until [he] is assessed by a sex offender therapist upon release from jail." 
 The family court held in abeyance other findings regarding Father and determination
 of Father's child support obligation.  Also, the family court ordered
 appointment of legal counsel and a guardian ad litem (GAL) for Father.  
On September 8, 2005, the family court conducted a merits
 removal hearing to review "issues pertaining to [Father]."  Although Father
 remained incarcerated in North Carolina, an attorney and a GAL represented him
 at the hearing.  The family court found "substantial risk of sexual abuse
 of [Children] by [Father] based on the presence of pornography in the home"
 and ordered entry of Father's name into the Central Registry of Sex Offenders. 
 Furthermore, the family court's order required Father to complete a
 sex-offender program, "either through the North Carolina prison system"
 or by contacting DSS "upon his release from prison . . . to be assessed
 for a treatment plan to include sex offender therapy."  The order
 reiterated the court's earlier requirement that Father have no contact with
 Children, direct or indirect, until he completed the sex-offender program.  The
 order also required Father to pay child support of $54 per week to Grandfather "upon
 [Father's] release from prison." 
On January 16,
 2007, the family court conducted a judicial review hearing.  Father, his
 attorney, and his GAL were absent.  The family court determined DSS
 intervention services were no longer needed and authorized Grandparents to
 retain physical and legal custody of Children.  Furthermore, the treatment plan
 stated Grandparents were "prevented from transferring custody to a third party
 without prior court permission."  The placement plan contained no new
 provisions regarding Father.  Thereafter, the family court closed DSS's case against
 Mother and Father and relieved Children's GAL.  The order stated child support
 would continue according to its prior orders.  
In April 2007,
 Grandfather filed a complaint to terminate the parental rights (TPR) of Mother
 and Father and a petition to adopt Children.  Father responded by advising
 Grandfather's attorney: 

 I do not intend to give up my
 parental rights to my children.  I want to write and see my children as quick
 as I can.  I appreciate my father-in-law taking care of my children, but I am
 not giving up my parental rights to them.  

On May 25, 2007,
 Mother signed an affidavit relinquishing her parental rights and consenting to
 Grandfather's adoption of Children.  Mother's affidavit stated she had custody
 of Children until March 15, 2005, and thereafter, Grandfather was Children's
 primary caretaker.  
On September 27,
 2007, Father filed a motion asking the family court to deny Grandfather's TPR action
 and to continue its then-existing orders regarding "custody, guardianship,
 visitation, and child support."  Father attached a handwritten,
 fifteen-page letter explaining his relationship with Children, his
 understanding of the family court's orders restraining him from contacting
 Children, his remediation efforts in prison, and the reasons he did not meet
 the statutory grounds for TPR set forth in Grandfather's complaint.  Father
 added: 

 [I]
 know being there part-time is better than no contact at all . . . .  [I] do not
 feel that giving up my parental rights is the best thing for my children.  I
 want to be the best father I can while I am in prison then continue that
 relationship when I get out and can support my children fully with continuous
 contact with them.  

In October 2007, Respondents
 filed a motion for leave to intervene and to bring their own action for TPR and
 adoption.  The family court granted the motion and temporarily transferred
 custody from Grandfather to Respondents.  On January 9, 2008, Respondents
 filed their action seeking TPR and adoption, asserting: "[D]ue to ill
 health, [Grandparents] can no longer physically care for [Children]."  Respondents
 contended that, since August 2006, they had "provided for [Children]
 financially, physically, emotionally and medically without regular financial
 assistance from either parent and [had] formed a close bond with [Children]
 such that [Children] [had] come to know and love [Respondents] as their primary
 caregivers."  
The following month, Father sent a letter to Respondents'
 counsel stating:  "I will not willfully relinquish my parental rights and
 obligations to [Children]."  Father contended Respondents' complaints
 against him were inaccurate and argued he did not meet any of the alleged statutory
 grounds for TPR.  Specifically, Father stated he had not willfully failed to
 visit or support Children, abandoned Children, or failed to remedy the
 conditions leading to their removal from Mother.  Father stated he had complied
 with the family court's orders requiring him to have no contact with Children
 until he completed the sex-offender program.  Father explained:

 The
 problem is that program is only offered in medium custody prison.  . . .  I
 have been trying to get my medium custody so I can take this program and be
 able to take part in my children's lives.  

Father also stated the family
 court ordered child support "beginning 30 days after my release
 from prison."  Finally, Father asserted:

 I did
 NOT abandon my children at all.  I was incarcerated for a crime and I am paying
 the price for it, so by no means did I want to be separated from my children. 
 I love my children with all my heart and soul and it is not in my children's
 best interest to be separated from each other.  . . .  [Grandfather] has denied
 . . . my family and me any and all information concerning the status of my
 children.  

On May 15, 2008,
 Father filed an answer denying Respondents' allegations, asking the family court
 to maintain his parental rights, and, upon his release from prison, to reopen
 issues of visitation, support, and custody.  Moreover, Father asked the family court
 to award custody and guardianship to Respondents and to require Respondents to
 keep him informed regarding Children.
On June 2, 2008,
 the family court conducted a final TPR hearing.  At that hearing, Grandfather
 testified Mother left Children with a friend, who later told DSS that Mother had
 "dropped [Children] off and hadn't been around for a while." 
 Grandfather stated DSS contacted him in December 2004 and told him Children
 would be put in foster care if he did not take them immediately.  Grandfather's
 custody of Children was formalized by the March 15, 2005, family court order.  
Grandfather
 testified that since Children had come into his custody, Father had written one
 letter to them.  He added: "And [the family court's] order says in part
 that [Father] is to have no contact with [Children] whatsoever.  So I simply
 destroyed the letter."  Grandfather acknowledged that shortly after
 Children came to live with him, Father registered Children to participate in a "prisoner
 gift program."  Grandfather testified Father had sent no support to him for
 Children's care; however, he later acknowledged the family court's order
 specified Father's child support obligation began thirty days after his release
 from prison.   
Next, the family
 court heard testimony from the three couples who had temporary custody of
 Children.  Mr. Doe testified he and Mrs. Doe met N.B. in December 2005 at
 Children's childcare center, where Mrs. Doe was then working.  Mrs. Doe was
 present but did not testify.  Mrs. Roe testified she and Mr. Roe met A.B., who
 was then eighteen months old, in January 2006.  Mrs. Roe explained:

 [Mr.
 Roe] is the uncle of [Mrs. Doe] who has [N.B.] and she works at the daycare,
 and she had [A.B.] in her infant room.  And she had contacted us knowing that,
 you know, we did not have any children.  So on and so forth.  And that
 [Grandparents] were having problems caring for A.B. because she was so small. 
 She was very active.  She was 18 months at the time.  And asked, you know, if
 we could help out by taking her, you know, a day or two here just to help them
 out because they needed help.

Mr. Roe was present but did
 not testify.  Mr. Moe testified he and Mrs. Moe met J.B. in August 2006 through
 a mutual friend.  Mr. Moe explained J.B. had been "off and on
 visiting" them when Grandfather filed his TPR action in April 2007, but he
 did not move into their home until October 2007.  Mrs. Moe was present, but did
 not testify.  All of the testifying Respondents acknowledged: (1) they had
 never communicated with Father; (2) after obtaining temporary custody in
 October 2007, they paid all of their respective child's expenses; and (3) if
 the family court denied their TPR and adoption action, they would continue to
 care for the child in their custody.  
Amanda Craven was
 appointed as Children's GAL in the underlying DSS action, which closed in
 January 2007, and in the subsequent private actions.  Craven acknowledged
 the family court's March 2005 and September 2005 orders stated that Children
 were removed due to Mother's neglect, and the only treatment goals for Father
 related to conditions "justifying intervention, but not removal." 
 Father's counsel asked Craven if she had "done anything to facilitate
 contact between [Father] and [Children] while he's in jail."  Craven
 responded:  "No.  The court order prohibits any contact between him and
 [Children]."  Craven admitted: "I don't know anything about [Father's]
 finances or assets."  
At the close of Respondents'
 evidence, Father's counsel submitted a written motion asking the family court
 to dismiss the action against Father, contending clear and convincing evidence
 failed to establish that Father satisfied any statutory ground for TPR.  The family
 court took the TPR matter under advisement and asked both parties to submit
 proposed orders.    
Three weeks later, the
 hearing resumed.  The family court found Father satisfied the following
 statutory grounds for TPR: (1) Father failed to remedy the conditions that led
 to Children's removal, (2) Father willfully failed to visit Children for six
 months, (3) Father willfully failed to support Children for six months, and (4)
 Father abandoned Children.  The family court additionally found TPR was in
 Children's best interest.  Thereafter, the family court excused Father's
 counsel and conducted the adoption hearing.  Later that day, the family court
 issued an order terminating Father's parental rights and another order granting
 Respondents' petitions to adopt Children.  
STANDARD OF REVIEW
Although "the
 grounds for TPR must be proved by clear and convincing evidence," an
 appellate court may examine the entire record in a TPR case "to determine
 facts in accordance with its own view of the evidence."  Stinecipher v.
 Ballington, 366 S.C. 92, 97, 620 S.E.2d 93, 96 (Ct. App. 2005).  Despite
 this broad scope of review, the appellate court should not necessarily
 disregard the findings of the family court because it was in a better position
 to evaluate the credibility of the witnesses and to assign weight to their
 testimony.  Charleston County Dep't of Soc. Servs. v. Jackson,
 368 S.C. 87, 95, 627 S.E.2d 765, 770 (Ct. App. 2006). 
LAW/ANALYSIS
I.  Statutory Grounds
 for TPR
Father contends the
 family court erred in finding clear and convincing evidence established he
 satisfied four statutory grounds for TPR.  We agree.
In South Carolina, TPR is governed by statute.  The family court can order TPR only upon finding the
 existence of one or more of the eleven statutory grounds and also finding TPR
 is in the child's best interest.  S.C. Code Ann. § 63-7-2570 (Supp. 2008).  Before
 terminating parental rights, the alleged statutory grounds must be proven by
 clear and convincing evidence.  Loe v. Mother, Father, & Berkeley County
 Dep't of Soc. Servs., 382 S.C. 457, 465, 675 S.E.2d 807, 811 (Ct. App. 2009). 
 On appeal, this court may review the record and make its own determination of
 whether the termination grounds are supported by clear and convincing
 evidence.  Id. 

 Clear
 and convincing evidence is that degree of proof which will produce in the mind
 of the trier of facts a firm belief as to the allegations sought to be
 established.  Such measure of proof is intermediate, more than a mere
 preponderance but less than is required for proof beyond a reasonable doubt; it
 does not mean clear and unequivocal.

Anonymous (M-156-90) v.
 State Bd. of Med. Examiners, 329 S.C.
 371, 374 n.2, 496 S.E.2d 17, 18 n.2 (1998) (internal citations and quotation
 marks omitted).
A.  Failure
 to Remedy
Father argues the
 family court erred in finding he failed to remedy the conditions that led to
 Children's removal.  We agree.  
One statutory
 ground for TPR addresses a parent's failure to remedy the conditions that led
 to the child's removal from the parent:

 The
 child has been removed from the parent . . . [and] has been out of the home for
 a period of six months following the adoption of a placement plan . . . and the
 parent has not remedied the conditions which caused the removal.

S.C. Code Ann. § 63-7-2570(2)
 (Supp. 2008).  
Here, DSS
 recommended, and the family court ordered, that Children be removed from
 Mother.  The record reflects "the conditions which caused the
 removal" related to Mother's neglect of Children.  The family court found
 no conditions pertaining to Father that merited Children's removal.  Father's
 imprisonment began more than a year before Children's removal.  He neither
 lived in the home nor exercised control over it at the time Children were
 removed, or thereafter.  As a result, Father had no ability to remedy the
 conditions that led to Children's removal from Mother.  Accordingly, the family
 court erred in finding Father satisfied this statutory ground for TPR.
B.  Grounds
 Requiring a Finding of "Willfulness"
Father argues the
 family court erred in finding he willfully failed to visit or support Children
 and in finding he willfully abandoned them.  We agree.  
A parent's conduct
 is "willful" when it demonstrates the
 "settled purpose to forego parental duties" and "manifests a
 conscious indifference to the rights of the child to receive support and
 consortium from the parent."   S.C. Dep't of Soc. Servs. v. Broome,
 307 S.C. 48, 53, 413 S.E.2d 835, 839 (1992).  
1.  Failure
 to Visit

 A statutory ground
 exists to terminate a parent's rights when:
 
 The
 child has lived outside the home of either parent for a period of six months,
 and during that time the parent has wil[l]fully failed to visit the child. The
 court may attach little or no weight to incidental visitations, but it must
 be shown that the parent was not prevented from visiting by the party having
 custody or by court order. The distance of the child's placement from the
 parent's home must be taken into consideration when determining the ability to
 visit. 
 

S.C. Code Ann. § 63-7-2570(3)
 (Supp. 2008) (emphasis added).  
This statutory
 ground for TPR requires satisfaction of two criteria: (1) the child must be
 absent from the parental home for six months, and (2) during that time, the
 parent willfully failed to visit the child.  Father's arrest and imprisonment in
 North Carolina removed him from the family's home in 2003.  The record includes
 a letter from Father, stating Mother brought Children to visit him in jail eight
 times before she and Children moved to South Carolina.  No evidence in the
 record established that Father failed to communicate with Children from the
 time they moved to South Carolina until they began living with Grandparents in
 December 2004.  
Additionally, no
 evidence in the record indicates the date Mother left Children with her
 friend.  Children certainly "lived outside the home" of their parents
 when they moved into Grandfather's home in December 2004.  Grandfather
 acknowledged while Children were living with him, Father arranged for them to
 receive gifts through a prisoner gift program.  On March 15, 2005, the family
 court entered an order removing Children from Mother.  By this order, the
 family court also mandated Father "shall have no contact, direct or
 indirect, with [Children] until [he] is assessed by a sex offender therapist
 upon release from jail."  Thus, after March 15, 2005, Father was prevented
 by a court order from having any contact, direct or indirect, with Children. 
Based on these
 facts, we find the record does not establish by clear and convincing evidence
 that Father, who was in prison in North Carolina, willfully failed to visit
 Children for a six-month period.  We find that aside from arranging gifts for
 Children through a prisoner program, Father did not visit or otherwise contact
 Children between the time they began living with Grandparents and entry of the
 no-contact order.  This period, from December 2004 to March 2005, comprises
 only three months.  Consequently, the family court erred in finding clear and
 convincing evidence supported Father's willful failure to visit Children for
 more than six months.  
2.  Failure
 to Support

 A statutory ground for TPR also exists when: 
 
 The
 child has lived outside the home of either parent for a period of six months,
 and during that time the parent has wil[l]fully failed to support the child.  Failure
 to support means that the parent has failed to make a material contribution to
 the child's care.  A material contribution consists of either financial contributions
 according to the parent's means or contributions of food, clothing, shelter, or
 other necessities for the care of the child according to the parent's means.  The
 court may consider all relevant circumstances in determining whether or not the
 parent has wil[l]fully failed to support the child, including requests for
 support by the custodian and the ability of the parent to provide support. 
 

S.C. Code Ann. § 63-7-2570(4)
 (Supp. 2008).  
The
 evidence pertaining to Father's purported failure to visit Children applies also
 to his failure to support them.  In both instances, the statutory clock began
 to run when Children began living outside the parent's home.  For the reasons
 discussed above, the record indicates Children began living outside the
 parental home in December 2004.  The family court's order of March 15, 2005, prohibited
 Father from having "any contact with Children, either direct or
 indirect."  That same order held in abeyance the determination of Father's
 child support obligation.  On September 8, 2005, the family court ruled
 Father's child support obligation would not commence until thirty days
 following his release from prison.  This order continued to prohibit Father
 having any contact, direct or indirect, with Children.  
Despite
 the family court's order, Respondents contend Father could have used his prison
 "canteen credits" to support Children.  However, no evidence
 indicated those credits could be distributed as support to Children.  Moreover,
 the record contains no evidence Father had any disposable income.  Therefore,
 the family court erred in finding clear and convincing evidence supported TPR
 based upon Father's willful failure to support Children for more than six
 months.  
3.  Abandonment      
Abandonment
 is another ground for TPR.  S.C. Code Ann. § 63-7-2570(7) (Supp. 2008).  "Abandonment"
 occurs when a parent "wil[l]fully deserts a child or wil[l]fully
 surrenders physical possession of a child without making adequate arrangements
 for the child's needs or the continuing care of the child."  S.C. Code
 Ann. § 63-7-20(1) (Supp. 2008).  Incarceration alone, even a lengthy
 incarceration, is not a ground for TPR.  S.C. Dep't of Soc. Servs. v.
 Ledford, 357 S.C. 371, 376, 593 S.E.2d 175, 177 (Ct. App. 2004).  However, when
 an incarcerated parent willfully disregards his child's wellbeing and
 continuing care, the family court may find abandonment.  Id. at 377, 593
 S.E.2d at 177-78.  
Here, after Father
 was incarcerated in November 2003, Children remained in Mother's care and
 custody for over a year.  According to Father, he remained in contact with
 Children through prison visits.  No evidence established that Father willfully
 deserted Children or failed to make arrangements for their care.  To the
 contrary, Father expected Children to live with Mother, and thereafter, he
 acknowledged appreciation for Grandfather's care of Children.  Furthermore,
 Father wrote lengthy letters to the family court expressing his desire to remain
 a part of Children's lives and asking the family court to give Respondents
 permanent custody of Children, but also to require Respondents to provide
 Father with information about Children.  Accordingly, the family court erred in
 finding clear and convincing evidence established that Father abandoned
 Children.  
II.  Remaining Issues
Father
 argues the issue of adoption was "not ripe for adjudication" until
 his appeal of the TPR ruling was finally determined.  He also contends the
 family court violated his constitutional rights by "holding a final
 adoption hearing on the heels of verbally issuing an order of [TPR]."  Because
 our decision to reverse the termination of Father's parental rights is
 dispositive of this appeal, we need not address these issues.  See Futch
 v. McAllister Towing of Georgetown, Inc., 335 S.C. 598, 613, 518 S.E.2d
 591, 598 (1999) (ruling an appellate court need not review remaining issues when its determination of a
 prior issue is dispositive of the appeal).  
CONCLUSION
As
 to whether the family court erred in terminating Father's parental rights, we
 find Respondents failed to establish by clear and convincing evidence that
 Father satisfied any of the four statutory grounds for TPR.  Therefore, we
 reverse the family court's termination of Father's parental rights.  As a
 consequence of this reversal, Father's parental rights remain intact, and we vacate
 the family court's order of adoption.  We remand this matter to the family
 court for entry of an order determining permanent custody.  Children shall
 remain in the custody of Respondents pending further order of the family
 court.  
Because
 our decision on the issue of TPR is dispositive of the appeal, we need not
 reach Father's remaining arguments.  
Accordingly,
 the order of the family court is 
REVERSED IN PART, VACATED IN PART, AND REMANDED.
WILLIAMS, J., and CURETON and GOOLSBY, A.JJ., concur.