742 S.E.2d 697

**SOUTH CAROLINA DEPARTMENT OF SOUTH CAROLINA DEPARTMENT OF
SOCIAL SERVICES, Respondent,**

**v.**

**CAMERON N.F.L., Billy J.S., and "John Doe," Defendants,**

**Of whom Cameron N.F.L. is the Appellant.**

**In the interest of a minor child under the age of 18.**

Appellate Case No. 2011–198926.

No. 5129.

Court of Appeals of South Carolina.

Heard April 4, 2013.

Decided May 2, 2013.

324

Andrew Richard Havran, of The Law Office of Andrew R. Havran, LLC, of Greer, for Appellant.

Patti Austin Brady, of the South Carolina Department of Social Services, of Pickens, for Respondent.

Steven Luther Alexander, of Alexander Law Firm, of Pickens, for the Guardian ad Litem.

HUFF, J.

Cameron N.F.L. (Mother) appeals the family court's termination of her parental rights to her minor child (Child). After careful consideration, we hold the family court erred in finding termination of Mother's parental rights was in Child's best interest.

**FACTS/PROCEDURAL HISTORY**

Mother gave birth to Child in September of 2003. On July 28, 2008, the Department of Social Services (DSS) filed an intervention action against Mother due to the deplorable conditions of Mother's home, allegations of drug abuse, and domestic disputes. At that time, Mother's home was excessively cluttered and infested with cockroaches.

DSS removed Child from Mother's home in March 2009, when Child was five years old. On January 6, 2010, the family court held a merits hearing for removal. The merits order authorized DSS to forego reasonable efforts to preserve the family. On June 21, 2011, the family court held a termination of parental rights (TPR) hearing.

Following Child's removal, Mother moved into a friend's trailer. Mother presented three witnesses who testified the trailer was clean and in good condition. DSS did not present testimony of a caseworker who visited the trailer.

In May 2010, Mother moved back into her prior home. Mother's witnesses testified Mother renovated the home and

kept it clean. Additionally, a DSS caseworker testified Mother gave birth to another child in July 2010, and DSS investigated Mother's home at that time to determine if it was safe for the infant. The DSS caseworker testified Mother's home was safe and suitable for an infant, and she did not see evidence of drug abuse or domestic violence. The case involving Mother's infant was unfounded. The second Guardian ad Litem (GAL) appointed to Child's case visited Mother's home the week before the TPR hearing and testified it was "clean and nice."

Mother testified Child lived in at least five foster homes during the first year he was in foster care. In September 2009, DSS placed Child at York Place Episcopal Home for Children (York Place). According to Child's therapist, Child is developmentally delayed; has physical and verbal aggression and neglect issues; exhibits self-destructive behaviors, anxiety, and signs of depression; and has been diagnosed with attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder. Child's therapist testified Child began regressing around December 2010, but she did not know what caused the regression. Child's therapist testified Child misses Mother, and she believes Mother and Child have a bond. She testified, "[W]hen the visits do occur . . . interaction is appropriate and . . . [Child] definitely has a significant bond with [Mother]." However, Child's therapist was concerned about Mother's "sporadic contact" with Child. When asked about Child's feelings about adoption, Child's therapist testified, "Adoption hasn't really been explored with him. When I spoke with his adoption worker [she] kind of felt that right now just trying to stabilize him and get him situated that he developmentally would not process well with adoption. . . ."

Child's initial GAL testified, "[T]here is a great love and bond between [Mother] and [Child]," and Child "says he would like to [go] home." However, she expressed concern about Mother's ability to provide structure and discipline for Child, and she believed TPR was in Child's best interest because Child needed "someone who can give him that stability and hands on expertise with dealing with his personality issues. . . ." She continued, "[I]t's very difficult for me to say, Judge, because I do see how much [Child] loves [Mother]." When asked whether Child was ready to be adopted, she

stated, "I don't think he would be ready yet. I mean, if he can continue to improve I think he would be adoptable."

The second GAL appointed to Child's case did not observe any contact between Child and Mother. However, she testified that every time she visited Child, he talked about Mother, and she believed a bond existed between Mother and Child. She testified TPR was in Child's best interest because Child needed special care and someone "who [could] handle someone with his difficulties." Child's GAL noted Child's medical issues and testified, "[I]t's going to take somebody with a lot of ability in that area to be able to take care of him." When asked whether she thought Mother could provide the care Child needed, she responded, "Well, if she's with him 24/7 the way the staff is at York Place[, but] she now has another child and she has a job."

Child's DSS caseworker testified Child missed Mother and always asked when he would see her again. However, she agreed DSS's plan for TPR was in Child's best interest because she felt Child needed permanency. She testified Region One Adoptions assessed Child and accepted him as a candidate for adoption.

DSS did not present testimony from a caseworker who was involved in Child's case between March 2009, when Child was removed, and March 2010, when the case was reassigned to an intensive foster care caseworker. When questioned about Mother's visitation with Child, the intensive foster care caseworker testified, "From my records she has visited." However, she testified Mother did not visit between March 1, 2010, and July 20, 2010. Child's therapist testified York Place allows parents one two-hour visit or two one-hour visits per month, and Mother visited Child in July 2010, September 2010, October 2010, December 2010, and May 2011, and attended a treatment plan review in August 2010. York Place is approximately one-hundred seventeen miles from Pickens County, or two hundred thirty-four miles round trip. Child's therapist did not have any records of Mother's visitation prior to June 2010, and she did not know when Mother visited prior to then. Mother failed to visit between December 2010 and May 2011; however, Mother testified her home burned in a

fire in December 2010, and she used her extra income to repair the home because she wanted it to be suitable for Child.

The family court found clear and convincing evidence supported TPR on the following grounds: (1) failure to support; (2) severe and repetitious abuse or neglect such that it was unlikely the home could be made safe within twelve months; and (3) Child had been in foster care for fifteen of the most recent twenty-two months. Additionally, it found TPR was in Child's best interest. This appeal followed.

## STANDARD OF REVIEW

In reviewing the decision of the family court, an appellate court has the authority to find the facts in accordance with its own view of the preponderance of the evidence. *Lewis v. Lewis*, 392 S.C. 381, 384, 709 S.E.2d 650, 651 (2011). While this court retains its authority to make its own findings of fact, we recognize the superior position of the family court in making credibility determinations. *Id.* at 392, 709 S.E.2d at 655. In addition, "consistent with our constitutional authority for de novo review, an appellant is not relieved of his burden to demonstrate error in the family court's findings of fact." *Id.* Thus, "the family court's factual findings will be affirmed unless 'appellant satisfies this Court that the preponderance of the evidence is against the finding of the family court.' " *Id.*

## LAW/ANALYSIS

Mother contends the family court erred in finding TPR was in Child's best interest.[1] We agree.

"The purpose of [the TPR statute] is to establish procedures for the reasonable and compassionate [TPR] where children are abused, neglected, or abandoned in order to protect the health and welfare of these children and make them eligible for adoption...." S.C.Code Ann. § 63–7–2510 (2010). In a TPR case, the best interest of the child is the paramount consideration. *S.C. Dep't of Soc. Servs. v. Smith*, 343 S.C. 129, 133, 538 S.E.2d 285, 287 (Ct.App.2000). "The

---

1. Mother also contends the family court erred in finding clear and convincing evidence of the statutory grounds for TPR. We decline to address this issue because our determination of the best interest issue is dispositive. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999).

interest[ ] of the child shall prevail if the child's interest and the parental rights conflict." S.C.Code Ann. § 63–7–2620 (2010). "Appellate courts must consider the child's perspective, and not the parent's, as the primary concern when determining whether TPR is appropriate." *S.C. Dep't of Soc. Servs. v. Sarah W.*, 402 S.C. 324, 741 S.E.2d 739 (2013) (Shearouse Adv. Sh. No. 14 at 37).

■ "The termination of the legal relationship between natural parents and a child presents one of the most difficult issues this Court is called upon to decide." *S.C. Dep't of Soc. Servs. v. Cochran*, 364 S.C. 621, 626, 614 S.E.2d 642, 645 (2005). "We exercise great caution in reviewing termination proceedings and will conclude termination is proper only when the evidence clearly and convincingly mandates such a result." *Id.*

The Supreme Court of South Carolina has considered bonding when determining whether TPR is in a child's best interest. In *Charleston County Department of Social Services v. King*, the court held TPR was in the child's best interest because he had bonded with his foster family and did not remember his biological family. 369 S.C. 96, 104–06, 631 S.E.2d 239, 243–44 (2006). It determined the family court correctly concluded TPR was in the child's best interest even though his older siblings had reunited with their mother. *Id.* at 99, 106, 631 S.E.2d at 240, 244.

Additionally, this court has considered future stability when determining whether TPR is in a child's best interest. In *Charleston County Department of Social Services v. Jackson*, this court reversed a family court order terminating the parental rights of an incarcerated father. 368 S.C. 87, 105, 627 S.E.2d 765, 775 (Ct.App.2006). We noted:

Child's current foster parents wish to remain as foster parents and, as of the TPR hearing, have not expressed an interest in adopting him. Thus, terminating Father's parental rights will not ensure future stability for Child. Moreover, keeping Father's parental rights intact will not disrupt Child's current living situation. Father does not gain custody of Child simply because [DSS] failed to terminate his parental rights at this time. Rather, by not terminating Father's parental rights, Father merely main-

tains his right to connect with Child as well as his obligation to support Child, emotionally, financially, or otherwise. *Id.* at 102–03, 627 S.E.2d at 774. We held TPR was not in the child's best interest even though the father's relationship with the child was "faint." *Id.* at 104, 627 S.E.2d at 775. This was in part due to Father's extraordinary efforts to locate and maintain a relationship with the child. *Id.*

Likewise, in *South Carolina Department of Social Services v. Janice C.*, this court held TPR was not in the children's best interest in part because the children enjoyed interacting with their mother and no pre-adoptive home had been identified. 383 S.C. 221, 229–30, 678 S.E.2d 463, 468 (Ct.App.2009). We reversed the family court's termination of the mother's parental rights even though testimony suggested the mother would never be able to adequately parent her children due to mental disabilities. *Id.* at 229–31, 678 S.E.2d at 468. In doing so, we noted that in the absence of a pre-adoptive home, "TPR will not provide future stability for [the c]hildren." *Id.* at 230, 678 S.E.2d at 468.

We find a valuable bond exists between Child and Mother. During the TPR hearing, both of Child's GALs and Child's therapist testified Child misses Mother and Child has a significant bond with Mother. The DSS caseworker testified Child frequently asked when he would see Mother again. Furthermore, Child's therapist testified Mother's contact with Child during visitation was appropriate. During oral argument, DSS admitted Child is bonded with Mother. When viewed from Child's perspective, it is undisputed a significant bond exists.

Additionally, the evidence suggests Child is not a viable candidate for adoption. *See* S.C.Code Ann. § 63–7–2510 (2010) ("The purpose of [the TPR statute] is to establish procedures for the reasonable and compassionate termination of parental rights where children are abused, neglected, or abandoned in order to protect the health and welfare of these children and make them eligible for adoption. . . ."). At the TPR hearing, Child's therapist testified she had not discussed adoption with Child because she was trying to get him stabilized, and she was not sure how he would process it. Likewise, the GAL testified she did not believe Child was ready to

be adopted. Child is currently nine years old and has several emotional and behavioral issues, including ADHD, oppositional defiant disorder, physical and verbal aggression, neglect issues, self-destructive behaviors, anxiety, and signs of depression. At the time of the TPR hearing, Child was in a group home, and Mother testified he had lived in five foster homes during the first year he was in foster care. During oral argument, DSS indicated Child is currently in a therapeutic foster home. DSS has not identified a pre-adoptive home for Child, and his age coupled with his emotional and behavioral issues suggest a suitable and willing adoptive home may not exist. Accordingly, it is unclear how TPR will ensure future stability for Child.

Based on undisputed evidence of Child's bond with Mother, the evidence that suggests he is not a viable candidate for adoption, and the fact that DSS has not identified a pre-adoptive home for Child, we hold the family court erred in finding TPR was in Child's best interest. Although we are cognizant of policy considerations that seek to prevent a child from languishing in foster care, we feel this case is distinguishable due to Child's strong bond with Mother and DSS's failure to identify a pre-adoptive home. We do not believe the existence of a bond alone is significant enough to preserve parental rights. Nor do we believe DSS must identify a pre-adoptive home prior to terminating parental rights. Our determination is based solely on the unique facts presented in this case, and we view this decision from the perspective of Child and not Mother. If Child was currently thriving in a pre-adoptive home, or if the evidence suggested Child did not want to see Mother or was not bonded with Mother, our decision might be different.

Accordingly, we reverse the decision of the family court and remand this case for a permanency planning hearing pursuant to section 63–7–1700 of the South Carolina Code (2010 & Supp.2012). A permanency planning hearing will allow all parties and the GAL an opportunity to update the family court on what has occurred since the TPR hearing. We make no finding as to whether reunification with Mother is in Child's best interest. We urge the family court to conduct a hearing as expeditiously as possible, including presentation of a new GAL report and an updated home evaluation of Mother's

residence. If necessary, the family court may, *inter alia*, change custody, modify visitation, and approve a treatment plan offering additional services to Mother.

## CONCLUSION

Based on the foregoing, we reverse the family court's order terminating Mother's parental rights and remand for a permanency planning hearing.

**REVERSED AND REMANDED.**

WILLIAMS and KONDUROS, JJ., concur.