675 S.E.2d 807

John and Jane LOE # 1 and John and
Jane Loe # 2, Respondents,

v.

MOTHER, FATHER, AND BERKELEY COUNTY
DEPARTMENT OF SOCIAL SERVICES,
Defendants,

of whom Mother is the Appellant.

In the interest of two minor children under the age of 18.

No. 4518.

Court of Appeals of South Carolina.

Heard Jan. 21, 2009.

Decided March 20, 2009.

Rehearing Denied May 4, 2009.

Rita J. Roache, of North Charleston, for Appellant.

R. Glenn Lister, Jr., of Mount Pleasant, for Respondents.

Sally C. Dey, of Charleston, Guardian Ad Litem.

PER CURIAM:

In this consolidated action, Mother appeals from the family court's order terminating her parental rights (TPR) to her daughter and son. On appeal, Mother argues the family court erred in: (1) finding any statutory ground for TPR was proven by clear and convincing evidence, (2) finding TPR was in her children's best interests, and (3) granting the foster parents' petitions to adopt Daughter and Son. Furthermore, Mother argues the family court erred in denying her mistrial motion and ordering her to pay one-third of the fees for the guardian ad litem (GAL) and the GAL's attorney. We reverse and remand.

## FACTS

Mother and Father married in 2002 and divorced two years later. They have three children together: Sister, now eight years old, and Daughter and Son, twins, who are now six years old. When Daughter was six months old, she was severely injured, purportedly while in Father's care.[1] Although Mother noticed Daughter's eyes were "rolling back and forth in her head," she waited two days before seeking medical care. Daughter's pediatrician testified he sent Daughter directly from his office to the hospital, where she remained for fourteen days. Physicians diagnosed Daughter's condition as non-accidental, subdural hematomas, i.e., "bleeding around the brain," which is often associated with "Shaken Baby Syndrome." Daughter's physicians testified her injuries were the result of physical abuse.

After the hospital reported Daughter's injuries to the Department of Social Services (DSS), law enforcement took the twins into emergency protective custody. Following a probable cause hearing, the family court granted DSS custody of Mother's three children. A month later, the court conducted a removal merits hearing, and thereafter, approved a placement

---

1. Mother testified Daughter "was fine" when she left the children with Father; however, when Mother returned from the grocery store, she noticed Daughter was "moving her arms and legs. She was sweating a lot."

plan (plan) granting Mother supervised visitation and requiring her to maintain employment and pay child support. A few months later, Mother and Father separated, and in December 2004, the family court granted Mother a divorce and issued a restraining order against Father. In October 2003, six months after Daughter's abuse, DSS voluntarily, and without a court order, returned Sister to Mother's custody. On August 23, 2004, the family court ratified returning legal and physical custody of Daughter to Mother.

In August 2004, the family court conducted the initial permanency planning hearing and noted Mother had stipulated to a finding that she physically abused Daughter.[2] At the time of the hearing, Daughter resided in foster care with John and Jane Loe # 1 (Loes # 1), and Son resided in foster care with John and Jane Loe # 2 (Loes # 2). The children's GAL and DSS recommended a permanent plan of reunification of Daughter and Son with Mother. The family court found Mother had "substantially complied" with the terms of her plan by securing and maintaining employment, completing a parenting assessment, and consistently paying child support. In consideration of Daughter's and Son's extensive medical needs, however, the court granted DSS's request for an extension for reunification, explaining:

> [Son] has a shunt that drains excess fluid from his brain and underdeveloped lungs. The shunt requires monitoring to ensure that it does not get clogged or [is] not draining properly. [Son's] breathing is normally rapid and shallow and requires monitoring for any changes or problems with breathing. If a problem should occur and the treatment is not administered in a timely manner, complications could result which could cause death. [Daughter] is developmentally delayed due to her injuries. [She] cannot sit upright without assistance and it takes approximately one hour to feed [her]. [Daughter] is unable to crawl on her hands and knees.... [She] currently attends occupational therapy, speech therapy, and physical therapy several times a week.

The family court conducted a second permanency planning hearing in April 2005 and found "it was more likely than not"

---

2. Four years later, however, social worker Rheba Dewitt testified DSS never determined who had inflicted Daughter's injuries.

Father had physically abused and neglected the children, and it ordered Father to have no further contact with his children. In contrast, regarding Mother, the court's order stated: "The permanency planning for reunification remains status quo." Furthermore, the court found it was in Daughter's and Son's best interests to modify Mother's plan to allow her to have weekly, unsupervised visits with Daughter and Son. The court authorized a six-month extension of foster care to give Mother more time to become involved in her children's medical care.

A week after the family court reaffirmed the plan for reunification, Loes # 1 and Loes # 2 (collectively, the Foster Parents) filed private actions against Mother, Father, and Berkeley County DSS. The Foster Parents' complaint asked the court to terminate Mother's and Father's parental rights, require DSS to prepare investigative reports necessary for adoption, issue a decree of adoption, and change the children's legal names. Nevertheless, DSS continued to move forward with its plan to reunite Mother with her children; a few weeks later, Daughter and Son began weekly, unsupervised, over-night visits with Mother and Sister. The overnight visits were suspended three months later, after Mother requested a meet-ing with DSS and stated she was overwhelmed by the de-mands of caring for Sister, as well as Daughter and Son, who were then age two. Thereafter, DSS modified Mother's visita-tion to Thursdays, from 10:30 a.m. to 4:30 p.m. Weekend, overnight visits resumed in July 2006, and thereafter, contin-ued without interruption.

When the family court conducted a third permanency plan-ning hearing in March 2006, Daughter and Son had resided in foster care for three years. Once again, the family court found Mother had completed her modified plan, consistently visited her children, and paid child support; nevertheless, the court expressed concern that overnight visitation had been unsuccessful. Noting DSS had "assessed the viability of adoption" and was now recommending "a concurrent plan" of reunification within six months or TPR and adoption, the court ordered DSS to continue providing services to Mother while it pursued both options. In October 2006, Mother submitted an affidavit to the court stating she had done everything DSS had asked of her. Mother's affidavit stated she was grateful for the care the Foster Parents had provided for her children, and

she asked the court to allow her children "to come home." Daughter and Son remained in foster care.

In January 2007, Mother filed an answer and counterclaim in response to the Foster Parents' complaint. Mother's pleadings stated custody of Daughter and Son should be returned to her because she had completed the terms of her DSS plans; moreover, Mother noted that since October 2003, DSS had found her home to be appropriate for Sister. Mother informed the court she had qualified for legal aid services, and she asked the court to hold the Foster Parents responsible for all fees associated with bringing their action, including the fees for the GAL and the GAL's attorney.

The family court consolidated the Foster Parents' actions and conducted a hearing in January and February 2007, that included six days of testimony on behalf of Mother and the Foster Parents. Ultimately, the family court terminated Mother's and Father's parental rights, granted the petition of Loes # 1 to adopt Daughter, granted the petition of Loes # 2 to adopt Son, ordered Mother to have no further contact with Daughter and Son, granted the Foster Parents' request to change the children's names, ordered revision of the birth certificates, denied Mother's mistrial motion, and ordered Mother to pay fees of approximately $10,000. Mother's appeal followed.[3]

## ISSUES

1. Did the family court err in terminating Mother's parental rights?

2. Did the family court abuse its discretion in ordering Mother to pay one-third of the fees for the GAL and the GAL's attorney?

3. Did the family court err in denying Mother's motion for a mistrial?

---

3. The family court also terminated the parental rights of Father, who did not attend the TPR hearing and was found in default. *See* S.C.Code Ann. § 63–7–2590(B) (Supp.2008) ("The relationship between a parent and child may be terminated with respect to one parent without affecting the relationship between the child and the other parent.").

## STANDARD OF REVIEW

In appeals from the family court:

[T]his court has authority to find the facts in accordance with our own view of the preponderance of the evidence. However, this broad scope of review does not require us to disregard the findings of the family court. We are mindful that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony.

*Pirri v. Pirri,* 369 S.C. 258, 264, 631 S.E.2d 279, 282–83 (Ct.App.2006) (internal citations omitted).

## LAW/ANALYSIS

### I. Termination of Parental Rights

Mother contends the family court erred in terminating her parental rights to Daughter and Son. We agree.

#### A. Fundamental Rights of Parents

The South Carolina Children's Code sets forth this State's policy regarding reunification: "It is the policy of this State to reunite the child with his family in a timely manner, whether or not the child has been placed in the care of the State voluntarily." S.C.Code Ann. § 63–1–20(D) (Supp.2008). Moreover, the Children's Code "shall be liberally construed to the end that families whose unity or well-being is threatened shall be assisted and protected, and restored if possible as secure units of law-abiding members...." S.C.Code Ann. § 63–1–30 (Supp.2008).

The United States Supreme Court has declared: "[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In respect for this fundamental right, our own supreme court instructs courts to proceed with thoughtful deliberation when deciding whether to terminate a parent's rights:

The termination of the legal relationship between natural parents and a child presents one [of] the most difficult

issues this Court is called upon to decide. We exercise great caution in reviewing termination proceedings and will conclude termination is proper only when the evidence clearly and convincingly mandates such a result.

... Parental rights warrant vigilant protection under the law and due process mandates a fundamentally fair procedure when the state seeks to terminate the parent-child relationship.

*S.C. Dep't of Soc. Servs. v. Cochran,* 364 S.C. 621, 626, 614 S.E.2d 642, 645 (2005). Moreover, the *Cochran* court provided specific guidance as to when courts can consider TPR: "The fundamental purpose of terminating parental rights is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for the physical, emotional, and mental needs of the child." *Id.* at 632, 614 S.E.2d at 648.

Citing the Fourteenth Amendment of the United States Constitution and the United States Supreme Court's decision in *Santosky v. Kramer,* this court declared:

Under the United States Constitution, natural parents are entitled to fundamentally fair procedures when the State seeks to sever the relationship they have with their child. In *Santosky,* the United States Supreme Court announced: "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.... When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."

*Charleston County Dep't of Soc. Servs. v. Jackson,* 368 S.C. 87, 96, 627 S.E.2d 765, 770 (Ct.App.2006) (quoting *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)) (internal citations omitted).

## B. Statutory Grounds for TPR

In South Carolina, TPR is governed by statute, and the family court can order TPR only upon finding one or more

of eleven statutory grounds exist and also finding TPR is in the child's best interest. S.C.Code Ann. § 63–7–2570 (Supp. 2008). "Before terminating parental rights, the alleged grounds for termination must be proven by clear and convincing evidence. On appeal, this Court may review the record and make its own determination of whether the termination grounds are supported by clear and convincing evidence." *S.C. Dep't of Soc. Servs. v. Mother ex rel. Minor Child,* 375 S.C. 276, 282–83, 651 S.E.2d 622, 625 (Ct.App.2007) (internal citations omitted).

> Clear and convincing evidence is that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established. Such measure of proof is intermediate, more than a mere preponderance but less than is required for proof beyond a reasonable doubt; it does not mean clear and unequivocal.

*Anonymous (M–156–90) v. State Bd. of Med. Examiners,* 329 S.C. 371, 375, 496 S.E.2d 17, 18 (1998) (internal citations and quotation marks omitted).

The family court found Mother satisfied the following statutory grounds for TPR: (1) Daughter had been harmed, and it was unlikely Mother could make the home safe within twelve months, pursuant to section 63–7–2570(1); (2) Mother had not remedied the conditions that caused the removal of her children, pursuant to section 63–7–2570(2); (3) Mother has a diagnosable condition that is unlikely to change within a reasonable time, and this condition makes it unlikely she can provide minimally acceptable care for her children, pursuant to section 63–7–2570(6); and (4) Mother's children have been in foster care for fifteen of the most recent twenty-two months, pursuant to section 63–7–2570(8).

Initially, we note that while a judicial decision to terminate parental rights is always difficult, the unique posture of this case gives us reason to exercise extreme caution. Typically, in a TPR case before this court, DSS initiates the TPR action because it has deemed a parent to be "unfit" or unwilling to raise a child that has been placed in the state's custody. This case is procedurally unique—DSS has aligned itself with Mother in opposing termination of her parental rights. Furthermore, DSS argued persuasively to the family court that

Daughter's and Son's best interests would be served by reuniting them with Mother and Sister.

We commend the Foster Parents for providing exceptional care to these medically fragile children throughout the four years that preceded the TPR hearing. We recognize Daughter and Son are thriving, in large part, because the Foster Parents consistently provided them with love and attentive care.

At the outset of our analysis, we point out that six days of testimony produced a dense, factually-intensive, and complex record. While the family court's order expressed great concern that Mother had not accompanied the Foster Parents on many of the children's medical appointments, we note Mother was consistently working two jobs to pay child support, yet still managed to join her children for many of their medical visits. The children's pediatrician testified Mother had met with him recently to discuss her children's medical conditions and acknowledged Mother demonstrated concern for her children.

Six months after Mother's three children were placed in foster care, DSS returned Sister to Mother's physical custody. Mother contends DSS would not have returned her three-year-old child if her home was unsafe. We agree.

At the first permanency planning hearing, conducted in August 2004, the court found Mother had "substantially complied" with the requirements of her placement plan. Thereafter, the court granted DSS's request to extend foster care, not because of Mother's shortcomings, but because Daughter's and Son's extensive medical needs were best met by continuing their temporary placement in therapeutic foster care.

At the TPR hearing, the principal of Sister's school testified: "[Mother] is a very involved parent. She's out in our school. If we need her, we call her and she will come." The principal reported Sister does well in school, is well-groomed, and has good manners. Furthermore, she stated the school coordinates speech therapy, occupational therapy, physical therapy, and transportation services for children who require these services.

Dr. Judith Hurt, a parenting coordinator, testified she had known Mother for six years and had observed Mother's interaction with her three children:

> I saw her work with the children, playing games and also doing some cognitive activities, reading with them and doing ... puzzles.... She knew that children had a very short time period of attention. She handled the misbehavior very well. There was never any screaming, any hollering. She knew how to use what we call "quiet time," just take them away from the activity.

Hurt testified she sent several letters to DSS asking them to give Mother "the opportunity to demonstrate to DSS that she is capable of being an effective mother." Hurt added that Mother lives with her mother, who is willing to help care for the children.

Since April 2005, Daughter and Son have had regular, unsupervised visits with Mother and Sister. In July 2006, these visits were extended to include weekends, from 4:00 p.m. on Friday to 2:00 p.m. on Sunday, and Thursday afternoons. We agree with Mother that DSS would not have continued Daughter's and Son's unsupervised visits with her for two years if Mother's home was unsafe or DSS had concerns about a repetition of the abuse Daughter had suffered four years earlier. Moreover, Mother contends Father caused Daughter's injuries, and Mother remedied the situation that led to her children's removal by divorcing Father in December 2004.

Medical University of South Carolina social worker Marcella Hamilton testified she began working with Mother shortly after her children were placed in foster care. Hamilton testified Mother had "some depressive symptoms" caused by environmental factors and stated an anti-depressant medication was prescribed for "a small period of time." When she was asked why Mother was depressed, Hamilton explained:

> Because [Mother] was young, I think she was 21 at the time. She had three small children. Her children had been taken away, the two babies had special needs. [Father] was no longer in the picture. She was doing everything she needed to do in terms of getting her children back. She was doing all the work. I believe that's enough to make anyone

depressed when you have all of those circumstances on you at one time.

Licensed clinical psychologist Jack Booth conducted parenting assessments of Mother in 2004 and 2006. Booth testified: "[I] felt much more comfortable that in the second interview [Mother] would certainly protect the children. She didn't want [Father] near them." Furthermore, when Booth was asked if Mother was ready to be reunited with her children, he responded: "I think if she has the capacity to learn, then she has the capacity to be taught; and the answer is yes."

In March 2006, Stephen James was appointed as the children's GAL in the underlying DSS action. James testified he had visited Mother's home and observed "the children were fine with [Mother]." James testified he had "no doubt" Mother is concerned about her children and loves them.

In May 2006, Sally Dey was appointed as the children's GAL in the Foster Parents' private action. Dey testified she visited Mother's home twice and also talked with her on the telephone. Dey visited Mother's home in July 2006, and her report stated: "At the time of my visit, [Mother] was having visitation with the twins. The home was clean and neat and there was adequate space for the children. The children appeared to be happy[,] and I did not see anything that would cause me concern for their safety." Yet, at the TPR hearing, Dey recommended TPR and adoption because "[t]hese foster parents have done an extraordinary job with these children."

■ The record establishes the Foster Parents have done an exceptional job caring for their foster children. However, the evidence also indicates Mother's home is now safe. Mother remedied the conditions that led to her children's removal by divorcing Father and completing two DSS placement plans. The evidence failed to show Mother has a diagnosable condition that would make it unlikely she could provide "minimally acceptable care" for Daughter and Son. Moreover, we find Mother consistently paid child support, consistently visited her children, and communicated regularly with the children's medical caregivers. Accordingly, in our view, the record before us does not establish by clear and convincing evidence that Mother: (1) could not make her home safe within twelve months, (2) failed to remedy the conditions that caused her

children's removal, or (3) has a diagnosable condition that is unlikely to change and makes it unlikely she can provide minimally acceptable care for her children.

The family court also found Mother met a fourth statutory ground for TPR, i.e., Daughter and Son had resided in foster care for fifteen of the most recent twenty-two months. This fact is indisputable. Mother correctly points out, however, DSS requested the extensions of foster care after Mother had fulfilled the court's requirements for her children's return. As a result, Mother contends the actions of others raised barriers and caused delays that resulted in her children remaining in foster care beyond the statutory time required to trigger this ground for TPR. We agree.

Many states have a statutorily mandated "improvement" period during which a parent must demonstrate consistent efforts and progress in meeting the requirements the court has specified for reunification. In South Carolina, when a child has resided in foster care for fifteen of the most recent twenty-two months, this ground alone is sufficient to satisfy a statutory ground for TPR. See Jackson, 368 S.C. at 101, 627 S.E.2d at 773; S.C. Dep't of Soc. Servs. v. Sims, 359 S.C. 601, 608, 598 S.E.2d 303, 307 (Ct.App.2004). In Jackson, we also recognized: "[T]he child and his parents share a vital interest in preventing erroneous termination of their natural relationship until the State proves parental unfitness." 368 S.C. at 96, 627 S.E.2d at 770 (quoting Santosky, 455 U.S. at 761, 102 S.Ct. 1388) (internal quotation marks omitted).

In this case, DSS testified it caused the delays in reunifying Mother and her children. DSS foster care supervisor Katina Ferguson testified Mother successfully completed two DSS plans. When Ferguson was asked if there was any reason Daughter and Son could not be reunited with Mother, Ferguson responded in the negative. Moreover, Ferguson testified DSS caused significant delays in Mother's case:

[Mother's] visitation with her children was supposed to be increased to a point where the children would be spending more time with [her] than in foster care. That way we would be able to assess her ability to care for the children; however, our efforts at doing that have been dual. There

have been barriers that have been put up to not allow that to happen.

DSS supervisor Barbara Parrott testified she first became aware of the possibility of TPR in October 2005. Parrott stated the only ground DSS had for TPR was fifteen of twenty-two months, and "we determined it was really not [Mother's] fault for that ground, and I did not take the case into the [TPR] unit." Parrott testified DSS staff told her Mother had remedied the conditions that led to her children's removal. Furthermore, she testified the DSS Adoptions Unit had declined Mother's case because "there was not sufficient evidence for grounds of [TPR]." Parrott testified it was understandable that Mother could not attend all of the children's appointments because of her work schedule; however, she stated if the children were returned, Mother "would have control over setting those appointments, which she does not [have] at this time." Moreover, several of the children's providers testified they are willing to schedule appointments that do not conflict with Mother's work schedule.

When asked why this case had been allowed to continue so long, Parrott responded:

> From my review of the file, it seemed like there were times when communication wasn't as it should have been. Staffings, one recommendation would be made and then something else would be put on the table. The treatment plan was changed a few times, and we didn't get back into court like we should have.

Parrott was forthright in acknowledging DSS probably "dropped the ball," and she stated: "[I]t is not [Mother's] fault." Parrott agreed the Foster Parents would provide a loving and suitable home for Daughter and Son, then she added: "But I feel like [Mother] will also." When asked why DSS had not filed a TPR action, Parrott responded: "[B]ecause our plan was reunification, and [Mother] had complied with all of the treatment plan."

DSS counsel Paul White asked the family court to deny the Foster Parents' request for TPR, stating:

> DSS dropped the ball. And that really is not something [Mother] had any control over. DSS does have its shortcomings and we are working on trying to overcome those

shortcomings, but the fact remains that a good many of the delays in this case have been departmental and not because of anything [Mother] did. So while it is true that the children have been in foster care 15 of the last 22 months . . . that can't all be ascribed to [Mother].

Because we have a duty to protect Mother's fundamental right to raise her children and entitlement to fair procedures, and because DSS admitted it caused the delays that allowed two of Mother's children to remain in foster care for fifteen of the most recent twenty-two months, we find clear and convincing evidence did not establish Mother satisfied this statutory ground for TPR.[4]

The eleven statutory grounds serve as a safety net that protects a fit and willing parent's fundamental right to raise his or her child. Even if the Foster Parents are perhaps better situated than Mother to offer advantages to Daughter and Son, we believe the fundamental right of a fit parent to raise his or her child must be vigorously protected. Because no statutory ground supports termination of Mother's parental rights to Daughter or Son, we need not consider whether terminating Mother's rights would be in her children's best interests. Accordingly, we reverse the family court's order terminating Mother's parental rights to Daughter and Son, return their legal and physical custody to Berkeley County DSS, and remand for a determination of whether the children can be safely returned to Mother's home.

## II. Guardian ad Litem Fees

Next, Mother argues it "seems unfair" to require her to pay almost $10,000 in fees to defend an action brought by the Foster Parents because she earns a minimal income working two jobs, and she is "unable to pay her own attorney's fees." We agree.

---

4. We also find support for our decision in this case from this language from a concurring opinion by Justice Pleicones: "I am not willing to sever the parent-child relationship solely on the basis that the child has spent fifteen of twenty-two months in foster care **where the appellant presented substantial evidence that much of the delay in the processing of this case is attributable to the acts of others.**" *Cochran*, 356 S.C. at 420, 589 S.E.2d at 756 (Pleicones, J. concurring) (emphasis added).

Appointment of a GAL in a private action is controlled by the South Carolina Private Guardian Ad Litem Reform Act, which became effective January 15, 2003, and states:

(A) In a private action before the family court in which custody or visitation of a minor child is an issue, the court may appoint a guardian ad litem only when it determines that:

(1) without a guardian ad litem, the court will likely not be fully informed about the facts of the case and there is a substantial dispute which necessitates a guardian ad litem; or

(2) both parties consent to the appointment of a guardian ad litem who is approved by the court.

§ 63-3-810 (Supp.2008). Furthermore, the Reform Act authorizes the family court to appoint an attorney to represent a non-attorney GAL. *See* § 63-3-820(E) (Supp.2008). When the family court determines appointment of an attorney to represent the GAL is necessary, it must "set forth the reasons for the appointment and must establish a method for compensating the attorney." *Id.*

At the time of appointment of a [GAL], the family court judge must set forth the method and rate of compensation for the [GAL], including an initial authorization of a fee based on the facts of the case. **If the [GAL] determines that it is necessary to exceed the fee initially authorized by the judge, the guardian must provide notice to both parties and obtain the judge's written authorization or the consent of both parties to charge more than the initially authorized fee.**

§ 63-3-850(A) (Supp.2008) (emphasis added). The statute provides the GAL is entitled to "reasonable compensation subject to the review and approval of the court." § 63-3-850(B). Moreover, in determining the reasonableness of GAL fees and costs, "the court must take into account" the following factors:

(1) the complexity of the issues before the court;

(2) the contentiousness of the litigation;

(3) the time expended by the guardian;

(4) the expenses reasonably incurred by the guardian;

(5) the financial ability of each party to pay fees and costs; and

(6) any other factors the court considers necessary.

§ 63–3–850(B) (Supp.2008).

As the TPR hearing reached an end, Mother's counsel stated:

[W]e would also ask that all [GAL] fees and attorney for the [GAL] fees be paid by [the Foster Parents]. There is uncontroverted testimony that [the Foster Parents'] income is sufficient to pay the cost and fees of this matter.

Mother earns $1,440 per month and has documented expenses of $1,118 per month. As a legal aid client, Mother's income is under 125% of the poverty level. Moreover, the Foster Parents brought the action and paid the GAL's retainer fee of $2,000.

"An award of GAL fees lies within the sound discretion of the family court judge and will not be disturbed on appeal absent an abuse of that discretion." *Nasser–Moghaddassi v. Moghaddassi*, 364 S.C. 182, 196, 612 S.E.2d 707, 714 (Ct.App. 2005). The record indicates the family court awarded the GAL, who was involved in this case from May 2006 to March 2007, fees and costs of $13,712, and it awarded the GAL's attorney, who was involved in the case from January 2007 to March 2007, fees and costs of $15,248.

In reviewing the reasonableness of these fees, the family court erred in applying the factors indicated in *Glasscock v. Glasscock*, 304 S.C. 158, 403 S.E.2d 313 (1991), rather than the factors mandated by the statute. Furthermore, the statute states an attorney-GAL is not authorized to have counsel appointed. We do not address whether the GAL fees were properly approved pursuant to section 63–3–850 or whether the fees are reasonable. Instead, we remand for a determination of whether the statutory requirements were met in authorizing fees for the GAL and the GAL's attorney and a determination of reasonableness, pursuant to the factors specified in section 63–3–850(B).

In light of our ruling as to TPR, we additionally instruct Mother is not responsible for paying the fees of either the GAL or the GAL's attorney; instead, the family court

must allocate the fees it finds to be reasonable among the Foster Parents and DSS. *See Camburn v. Smith,* 355 S.C. 574, 581, 586 S.E.2d 565, 568 (2003) ("[W]here guardian ad litem fees are incurred in an action that is found meritless on appeal, the party instigating the action should pay."); *S.C. Dep't of Soc. Servs. v. Tharp,* 312 S.C. 243, 245, 439 S.E.2d 854, 856 (1994) (finding DSS liable for a reasonable GAL fee and remanding for a hearing de novo and development of a full record).

## CONCLUSION[5]

We find the clear and convincing evidence does not support a statutory ground for termination of Mother's parental rights to Daughter and Son. Accordingly, we reverse the judgment of the family court in terminating Mother's parental rights and in granting the Foster Parents' petitions to adopt their foster children; we return legal and physical custody of Daughter and Son to Berkeley County DSS; and we remand the case to the family court for (1) a review of the GAL's and the GAL's attorney's fees and a determination of responsibility for payment of these fees and (2) a hearing on appropriate temporary and permanent custody of Daughter and Son.[6]

The order of the family court is

**REVERSED AND REMANDED.**

HEARN, C.J., SHORT and KONDUROS, JJ., concur.

---

5. Mother additionally argued the family court erred in denying her mistrial motion. Because our determination of the prior issues is dispositive, we need not review this issue. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

6. We note Berkeley County DSS and Mother, whose parental rights have been reestablished, are the parties to the family court's hearing regarding a new permanency plan for Daughter and Son.