**SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,**

v.

**MOTHER and Father, Defendants,**

**of whom Mother is the, Appellant.**

**In the interest of three minor children under the age of 18.**

**No. 4922.**

Court of Appeals of South Carolina.

Heard Sept. 13, 2011.

Decided Dec. 16, 2011.

Appeal from Lancaster County; W. Thomas Sprott, Jr., Family Court Judge.

Sally A. Carver–Young, of Rock Hill, for Appellant.

Angela M. Killian, of Lancaster, for Respondent.

Coreen B. Khoury, of Lancaster, for Guardian ad Litem.

PER CURIAM.

Mother appeals from the family court's order requiring the South Carolina Department of Social Services (SCDSS) to forego reunification efforts and to file a petition to terminate Mother's parental rights to her eight-year-old twins. We reverse this portion of the family court's order and remand the case to the family court for further proceedings consistent with this opinion.[1]

## FACTS/PROCEDURAL HISTORY

Mother and Father (Parents) are legally separated; together, they have five biological children.[2] Only their eight-year-old twins (Twins) are subject to this action.[3]

SCDSS became involved in this case in June 2007, after Parents' fourth child tested positive for cocaine and marijuana at birth. The baby was presumed to be an abused or neglected child, and SCDSS immediately placed the child in emergency protective custody (EPC).[4] Pursuant to alternative caregiver agreements, Parents' two-year-old child was placed with

---

1. The family court's order pertained to Mother and Father; however, only Mother appeals from the order. Accordingly, this opinion has no effect on the family court's order as it pertains to Father. See S.C.Code Ann. § 63-7-2590(B) (2010) ("The relationship between a parent and child may be terminated with respect to one parent without affecting the relationship between the child and the other parent.").

2. At oral argument, Mother's counsel stated that Parents remain separated, but have not divorced.

3. The family court's order also required SCDSS to file a petition to terminate Parents' parental rights to a third child. On September 17, 2010, Parents voluntarily relinquished their rights to this child, and on December 9, 2010, the child was adopted by his foster parents, the Roes. At oral argument, the parties stipulated to these facts. As a result, sections of the family court's order related to permanency planning for this child are now moot.

4. See S.C.Code Ann. § 63-7-1660(F)(1)(a) (2010) (stating it is presumed that a newborn child, whose blood or urine test shows the presence of a controlled substance that is not the result of medical treatment, is an abused or neglected child who cannot be protected from further harm without being removed from the custody of the mother).

family friends, the Roes, and Twins, then four years' old, were placed with their grandmother.[5]

On July 31, 2007, the family court conducted a merits hearing concerning the emergency removal of Parents' newborn child.[6] At this hearing, the family court appointed Dennis Foley to serve as guardian ad litem (GAL) for the child. Regarding Parents' Twins and two-year-old child (Children), the court found Parents had physically neglected Children; however, it determined their neglect was not "willful or reckless." While Children remained with their alternative caregivers, Parents were ordered to complete a treatment plan (Plan), which included substance abuse counseling and random drug screening.

In January 2008, Parents moved from Lancaster County, South Carolina to Charlotte, North Carolina. On May 7, 2008, SCDSS filed a complaint for removal of Children after learning Parents had violated Twins' alternative caregiver agreement and were being investigated by the North Carolina Department of Social Services (NCDSS) for using marijuana and cocaine in Twins' presence. In its complaint, SCDSS alleged Parents had failed to comply with their Plan and each had tested positive for cocaine. Parents were then expecting the birth of their fifth child.

On May 30, 2008, Mother gave birth to her fifth child. This child was born in North Carolina and tested positive for cocaine at birth. The child was immediately placed in EPC with NCDSS. This child continues to reside in foster care in North Carolina.

On June 3, 2008, Twins were placed in EPC with SCDSS. Two weeks later, the family court conducted a hearing on the merits of their removal from Parents' home. At this hearing, the court found Children were "at substantial risk of physical neglect" due to Parents' continued drug use. Following the hearing, the court granted SCDSS custody of Children.

---

5. The Roes later became this child's foster parents, and they adopted the child on December 9, 2010.

6. The court found that Mother had physically abused her newborn child through her prenatal use of drugs. As a result, the court ordered Mother's name entered into the Central Registry of Child Abuse and Neglect.

Twins were placed in foster care with the Does, while the younger child remained in the Roes' home. The court appointed Dennis Foley to serve as Children's GAL.[7]

The court granted Parents supervised visitation with Children and ordered them to complete a Placement Plan (Plan) within twelve months.[8] The Plan required Parents to: (1) submit to random drug screens; (2) complete psychological evaluations; (3) pay child support; and (4) obtain and maintain suitable housing. The Plan expressly required Mother to obtain and maintain employment, and to continue her participation in outpatient substance abuse treatment. The Plan ordered Father to maintain employment, complete parenting classes, and obtain a substance abuse evaluation. Finally, the court ordered SCDSS to pursue concurrent plans for family reunification and termination of parental rights (TPR).[9] The court's order stated: "[Parents] have two choices, their children or the drugs, and they will not regain custody of their children if they choose the drugs."

The family court conducted its initial permanency planning hearing on May 19, 2009.[10] The court found Mother had complied with most of her Plan's requirements, including: consistently visiting Children; successfully completing an outpatient drug treatment program; testing negative for drugs;

---

7. Dennis Foley was then serving as GAL for Parents' fourth child, who had tested positive for drugs at birth in June 2007 and was residing in foster care. In July 2008, the family court terminated Parents' rights to this child.

8. If the court orders that a child be removed from the custody of a parent, the court must approve a placement plan at the removal hearing or within ten days after the hearing. S.C.Code Ann. § 63–7–1680(A) (2010 & Supp.2010).

9. SCDSS may proceed concurrently with efforts to "make it possible for the child to return safely to the home" and with efforts to place a child for adoption or with a legal guardian. S.C.Code Ann. § 63–7–1640(D) (2010 & Supp.2010).

10. At the initial permanency planning hearing, the court reviews the status of a child placed in foster care and the progress being made toward the child's return home or toward another permanent plan approved by the family court at the removal hearing. The permanency planning hearing must be held no later than one year after the child is first placed in foster care. S.C.Code Ann. § 63–7–1700(A) (2010 & Supp.2010).

successfully completing a parenting program; obtaining and maintaining stable employment; and completing a domestic violence counseling program. Although Father had visited Children consistently and had completed a parenting program, he had failed to maintain steady employment, and—one month after completing an intensive outpatient substance abuse treatment program—he twice tested positive for cocaine. The court found it could not allow Children to return home because Parents had not yet obtained suitable housing; furthermore, Father had not maintained employment and had tested positive for cocaine. The GAL recommended that Children remain in foster care while SCDSS continued family reunification efforts.

The family court's permanency planning order found the "best interests of [C]hildren would be served for [Parents] and SCDSS to continue to work towards return of [C]hildren to the home." Therefore, the court granted the parties a six-month extension to complete the Plan, and it ordered SCDSS "to continue to pursue the permanent plan of reunification for [Children] concurrent with [TPR] and adoption." The court's order noted: "It is clearly not in [C]hildren's best interests for SCDSS to initiate [TPR] at this time because [Parents] have made some progress towards removing the risk of harm to [C]hildren." The court added: "Based on [Parents'] progress, I find that if all parties comply with the terms of this order during the next six months, unreasonable risk of harm should be removed." The court further advised: "[R]eturn of [C]hildren to [Parents] may be expected if [Parents] make those changes in circumstances, conditions, and/or behavior detailed in the Treatment/Placement Plan."

On July 9, 2009, Mother and Father signed a Contract of Separation and Property Settlement Agreement. Thereafter, Father moved to his mother's home in Gaston County, North Carolina, and Mother obtained housing in Charlotte.

The family court conducted its second permanency planning hearing in February and March 2010; the hearing lasted for four days. After the first day, Father informed the court that he consented to termination of his parental rights; as a result, the remainder of the hearing focused on whether it was in

Children's best interests for the court to order SCDSS to pursue termination of Mother's parental rights.

At the hearing, SCDSS foster care manager Tracy Rabon testified that Twins had been in foster care with the Does for the past twenty-one months. Rabon acknowledged that Mother had fulfilled the requirements of her Plan, including: completing a drug treatment program; consistently testing negative for drugs; making material contributions of food, clothing, and gifts to Children; and maintaining employment. Rabon expressed concern, however, that Mother's housing was not suitable because Father recently had moved to a nearby residence. Rabon reported that Twins suffered anxiety following visits with Mother and had expressed interest in remaining with the Does. Rabon stated, in her opinion, TPR was in the best interests of Children.[11]

Psychologist Lisa Jackel also testified at the hearing; Dr. Jackel had evaluated Children in June 2009. Dr. Jackel testified that TPR was in Children's best interests because their foster families were providing stability. Dr. Jackel stated she would not recommend "disrupt[ing] that without any good and substantial evidence that the alternative environment would be just as well [sic]." Dr. Jackel acknowledged that she had evaluated Children only once and had formed her recommendation without speaking to either Mother or Children's GAL.

Dennis Foley testified that he had served as Children's GAL since their emergency removal in June 2008. After his appointment as GAL, Foley visited Children twice a month and had observed their interactions with Mother and their respective foster families. Foley testified, in his opinion, termination of Mother's parental rights was not in the best interests of Children. Foley explained that Mother, now age thirty-nine, had made dramatic changes following the birth and subsequent emergency removal of her fifth child in May 2008. According to Foley, Mother made a:

11. During the permanency planning hearing, the court was considering the Plan for each of Mother's three children. As a result, the testimony often related to the Twins and their brother, who was later adopted by the Roes.

[H]erculean effort to overcome her drug problem and to do what she needed to do to get her children back. I believe her children love her. I believe her children are attached to her, and I believe her children would be happy to be with her, so, therefore, as [C]hildren's advocate, I would recommend reunification.

Regarding Mother's ability to support Children, Foley testified that Mother works as a waitress, and she has a good support network to assist her in caring for Children. When Foley was asked if he had concerns that Mother worked the "third shift," he responded: "No ... [M]other did everything that we asked in the treatment plan. She completed her plan. She [has] done what she was asked to do, so no, I don't have any concerns." Foley described Mother's Charlotte residence as providing a clean and safe environment, noting Mother had already set up appropriate furniture for Children. Foley emphasized that Mother had remained drug-free for twenty months, adding: "She's been through drug court and all those programs and I think she's made a really remarkable recovery." Foley did acknowledge, however, having concerns that Father had moved to a residence near Mother's home, stating: "[I] notified the guardian ad litem of Mecklenburg to make her aware and she told me that she's never seen any evidence of [Father] at [Mother's] home and would continue to monitor that."

Mother testified that she and Father were currently separated, and they planned to divorce.[12] Mother acknowledged having had a drug problem since age sixteen; however, she explained that, for the past two years, she consistently had tested drug-free. Mother asserted that she has a strong bond with Twins, had successfully completed all the goals in her Plan, and had completed an intensive drug treatment program through the Mecklenburg County drug court. Mother attends Narcotics Anonymous (NA) regularly and remains in contact with her NA sponsor.

Since the removal of the Twins in June 2008, they have resided in foster care with the Does. Mr. Doe testified regarding his observations of the visits between Twins and Mother:

---

12. At oral argument, Mother's counsel stated that Mother and Father had not yet divorced.

"I observed a couple [of] little boys that love their Mom." Mr. Doe stated he had no concerns about Twins returning to Mother's home, and he contended reunification with Mother was in their best interests:

> I'm kind of biased in that. I was orphaned when I was little, and I've known all my life that ... there's nothing that can substitute a biological mother for anyone. There's something about a biological mother that has an unconditional love for their children....

Mrs. Doe acknowledged Twins had experienced some anxiety about returning to Mother's home. She explained, however, that she had experience raising other foster children and was able to reduce Twins' anxiety by providing them with a caring environment, while setting boundaries that emphasized that their placement with the Does was temporary.

The family court filed its permanency planning order on June 4, 2010. Although the court expressed having some reservation, it determined TPR was the proper permanent plan for Twins. As a result, the court ordered SCDSS to initiate TPR proceedings against Parents and to terminate efforts to reunify the family. Thereafter, the family court denied Mother's motion for a new trial and her subsequent motions to reconsider pursuant to Rules 52, 59, and 60, SCRCP. This appeal followed.

## LAW/ANALYSIS

### 1. STANDARD OF REVIEW

In deciding an appeal from the family court, "this Court may find facts in accordance with its own view of the preponderance of the evidence." *Miles v. Miles*, 393 S.C. 111, 117, 711 S.E.2d 880, 883 (2011). As a result, the standard for appellate review of the family court's decision is de novo:

> [W]hile retaining the authority to make our own findings of fact, we recognize the superior position of the family court judge in making credibility determinations. Moreover, consistent with our constitutional authority for *de novo* review, an appellant is not relieved of his burden to demonstrate error in the family court's findings of fact. Consequently, the family court's factual findings will be affirmed unless

"appellant satisfies this court that the preponderance of the evidence is against the finding of the [family] court."

*Lewis v. Lewis,* 392 S.C. 381, 392, 709 S.E.2d 650, 655 (2011) (quoting *Finley v. Cartwright,* 55 S.C. 198, 202, 33 S.E. 359, 360–61 (1899)); *see also Simmons v. Simmons,* 392 S.C. 412, 414–15, 709 S.E.2d 666, 667 (2011) (citing *Rutherford v. Rutherford,* 307 S.C. 199, 414 S.E.2d 157 (1992)) ("In appeals from the family court, this Court reviews factual and legal issues de novo.").

## II.  PERMANENCY PLANNING

Mother argues the family court erred in ordering SCDSS to proceed with TPR rather than finding that she had remedied the conditions that caused Twins' removal.  We agree.

"The South Carolina Children's Code sets forth this State's policy regarding reunification." *Loe v. Mother, Father, & Berkeley County Dep't of Soc. Servs.,* 382 S.C. 457, 463, 675 S.E.2d 807, 810 (Ct.App.2009) (reversing the family court's order to terminate Mother's parental rights after finding Mother had successfully completed her placement plan and had remedied the conditions that led to her children's removal).

It is the policy of this State to reunite the child with his family in a timely manner, whether or not the child has been placed in the care of the State voluntarily.  Moreover, the Children's Code shall be liberally construed to the end that families whose unity or well-being is threatened shall be assisted and protected, and restored if possible....

*Id.* at 463, 675 S.E.2d at 810 (internal citations and quotation marks omitted).

At a permanency planning hearing, the family court "review[s] the status of a child placed in foster care upon motion filed by the department to determine a permanent plan for the child." S.C.Code Ann. § 63–7–1700(A) (2010 & Supp.2010).

If the court determines at the permanency planning hearing that [1] the child may be safely maintained in the home in that the parent has remedied the conditions that caused the removal[,] and [2] the return of the child to the child's parent would not cause an unreasonable risk of harm to the child's life, physical health, safety, or mental well-being, the

court **shall** order the child returned to the child's parent. The court may order a specified period of supervision and services not to exceed twelve months.

S.C.Code Ann. § 63–7–1700(D) (2010 & Supp.2010) (emphasis added).

If the court determines the criteria in section 63–7–1700(D) are not yet met, "but that the child may be returned to the parent within a specified reasonable time not to exceed eighteen months after the child was placed in foster care," the court may order an extension for reunification. S.C.Code Ann. § 63–7–1700(F) (Supp.2010). However, the statute restricts the conditions under which the family court may grant an extension for reunification:

[I]n no case may the extension for reunification continue beyond eighteen months after the child was placed in foster care. An extension may be granted pursuant to this section **only** if the court finds:

(1) that the parent has demonstrated due diligence and a commitment to correcting the conditions warranting the removal so that the child could return home in a timely fashion;

(2) that there are specific reasons to believe that the conditions warranting the removal will be remedied by the end of the extension;

(3) that the return of the child to the child's parent would not cause an unreasonable risk of harm to the child's life, physical health, safety, or mental well-being;

(4) that, at the time of the hearing, initiation of termination of parental rights is not in the best interest of the child; and

(5) that the best interests of the child will be served by the extended or modified plan.

S.C.Code Ann. § 63–7–1700(F) (Supp.2010) (emphasis added).[13]

At the initial permanency planning hearing, conducted in May 2009, the family court found Twins' best interests would be served if Parents and SCDSS "continue[d] to work towards

---

**13.** This provision was added by South Carolina Laws Act 160, section 4, which became effective on May 12, 2010.

return of [C]hildren to the home." As a result, the court granted a six-month extension of the Plan and ordered SCDSS to continue providing services, while concurrently planning for reunification with Parents and TPR. The court noted Parents had made progress towards removing the risk of harm to Children and could expect Children to return if they made the changes required by the Plan.

If, after a permanency planning hearing, the court has extended foster care for the purpose of reunification with the parent, the court must select a permanent plan for the child other than another extension for reunification purposes at the next permanency planning hearing. S.C.Code Ann. § 63–7–1700(I)(2) (2010 & Supp.2010).

The court conducted its second permanency planning hearing in February 2010.[14] In its permanency planning order, filed on June 4, 2010, the family court determined TPR was the appropriate permanent plan for Twins. The court stated that the initial permanency plan had anticipated that Father "would be part of the family unit and would help raise these children." Regarding Parents' separation, the court stated:

On the one hand, this separation is viewed as a positive thing in that the father would be away from the mother and children, so they would no longer be exposed to his drug abuse. On the other hand, it meant there would be no father in the home to help with the children. The anticipated stability in having two parents in the home was lost.... The plan never anticipated that the father would not be involved.... The mother, along with whatever social services may be available, is left alone. As much as she loves these children and as much as they care for her, her ability to provide for them has been severely reduced by the loss of the anticipated help of the father.... Without the help of the father, the mother's ability to provide is strained.

In ordering SCDSS to initiate TPR proceedings against Parents and to terminate efforts to reunify the family, the court expressed concern that, at the hearing, Mother had appeared "totally unprepared" to enroll her children in school.

---

14. The second permanency planning hearing was scheduled to be held "on or before November 19, 2009"; however, it was continued until February 23, 2010.

The court acknowledged that the psychologist's recommendation in favor of TPR had influenced its determination that TPR was in Children's best interests. The court also stated it had "weighed the [GAL's] recommendation heavily and it is not without a great deal of deliberation that this court decided not to follow his recommendation."

Our review of the record indicates Mother successfully fulfilled each requirement of her Plan. Most importantly, Mother completed an intensive drug treatment program, tested negative for drugs for twenty consecutive months, and obtained suitable housing for Twins. Moreover, in July 2009, Mother legally separated from Father, who had not become drug-free. Guardian ad litem Dennis Foley, who had worked with Children continuously since June 2008, testified Mother's residence provided a clean and safe environment for Twins. Foley stated he was not concerned about Mother's ability to arrange appropriate care for Twins while she worked. Although SCDSS had expressed concern that Mother lacked knowledge of schools available for Twins, Foley testified Mother had "told [him] the name of the school and showed [him] where [Twins] would get on the bus." Foley added that Mecklenburg County had educational and social services in place that would supervise and reinforce the successful reunification of Mother and Twins.

In our view, returning Twins to Mother's home is statutorily required because their return "would not cause an unreasonable risk of harm to [Twins'] life, physical health, safety, or mental well-being." Although concerning, we cannot characterize Mother's limited financial ability and Father's proximity as causing an "unreasonable risk of harm" to Twins-of such magnitude that TPR is required. We are influenced by the GAL's testimony that Mother has remedied the conditions that caused Twins to be removed from her custody. We also note that both the GAL and Twins' foster father stated TPR was **not** in Twins' best interests.

In sum, we believe a preponderance of the evidence supports returning Twins to Mother's home and ordering SCDSS to continue providing supervision and services for twelve

months. Accordingly, we find the family court erred in ordering SCDSS to initiate TPR proceedings against Mother.[15]

## CONCLUSION

We reverse the family court's order requiring SCDSS to initiate TPR proceedings against Mother, and we remand this case to the family court for proceedings consistent with this opinion. Accordingly, the decision of the family court is

**REVERSED and REMANDED.**

SHORT, WILLIAMS, and GEATHERS, JJ., concur.

---

**15.** In light of our decision, we need not address Mother's remaining issues on appeal. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (explaining this court need not review remaining issues on appeal when its determination of a prior issue is dispositive).