**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE
CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Benjamin McDermott and Kristi McDermott,
Respondents,

v.

Sharon Melvin, Joseph Gray, and South Carolina
Department of Social Services, Defendants,

Of whom Sharon Melvin is the Appellant.

In the matter of a child under the age of eighteen.

Appellate Case No. 2023-000115

———————

Appeal From Anderson County
M. Scott McElhannon, Family Court Judge

———————

Unpublished Opinion No. 2024-UP-298
Submitted August 9, 2024 – Filed August 19, 2024

———————

**REVERSED AND REMANDED**

———————

John Brandt Rucker and Allyson Sue Rucker, both of
The Rucker Law Firm, LLC, of Greenville, for
Appellant.

David James Brousseau, of McIntosh, Sherard, Sullivan
& Brousseau, of Anderson, for Respondents.

John Marshall Swails, Jr., of Greenville, for Guardian ad Litem Karen Horton.

Floy Kenyon Anderson, of Kenyon & Anderson, of Anderson, as Guardian ad Litem.

---

**PER CURIAM:**  Sharon Melvin (Mother) appeals the family court's final order terminating her parental rights to her minor child (Child).  On appeal, she argues the family court erred in (1) finding she had not remedied the conditions that caused Child's removal, (2) finding Child had been in foster care for fifteen of the most recent twenty-two months, (3) relying too heavily on the testimony of the private guardian ad litem (GAL), and (4) finding termination of parental rights (TPR) was in Child's best interest.  We reverse and remand.

The procedural background of this TPR action is extensive.  Although the underlying Department of Social Services (DSS) removal action began in July of 2019, Child and her older sister (Sibling) were involved in a previous DSS removal action.  In the first action, Sibling was removed from Mother's care in late 2017 after Sibling tested positive for methamphetamine and marijuana, and Child was removed in March of 2018, when Mother and Child tested positive for marijuana at Child's birth.  Child and Sibling resided in separate foster homes, and the McDermotts (Foster Parents) took Child home from the hospital when she was three days old.  She resided with Foster Parents until June of 2019, at which point she and Sibling were returned to Mother's care.  Child and Sibling were removed from Mother's care just three weeks later in July 2019 after Sibling tested positive for heroin and Child tested positive for heroin and marijuana.

Following the July 2019 removal, Child returned to Foster Parents' home.  A February 2020 merits removal hearing was continued due to insufficient time to conduct the hearing, and shortly thereafter, the COVID-19 pandemic began delaying in-person hearings.  According to DSS employees' testimony at the TPR hearing, DSS initially planned to only seek TPR; however, following the continued February 2020 hearing, the agency changed its plan to TPR concurrent with reunification out of a desire to avoid a protracted trial on the merits of the removal.

At the July 2020 merits hearing, Mother agreed to a finding pursuant to *North Carolina v. Alford*[1] that she physically abused Child, and the family court ordered her name placed on the Central Registry of Child Abuse and Neglect.  The court approved a permanent plan of reunification concurrent with TPR and adoption and ordered Mother to complete a placement plan.  The plan required Mother to, *inter alia*, demonstrate her ability to be self-sufficient and to recognize the negative effects of codependent relationships on herself and Child, complete a substance use assessment and follow any resulting recommendations, maintain verifiable income to provide for Child's basic needs, attend individual counseling and follow any recommendations made by the counselor, and maintain safe and independent housing.  The housing requirement prohibited Mother from residing "with anyone [with] an unsafe criminal background as determined by DSS."

At an April 13, 2021 permanency planning hearing, the family court ordered Sibling returned to Mother.  The court also approved the return of Child to Mother; however, it did not order Child returned to Mother at that time because it determined "an additional period of services/supervision [wa]s needed."  The family court found Mother had complied with her placement plan, approved a permanent plan of reunification concurrent with TPR, and directed DSS to file a complaint for TPR within sixty days.  On October 25, 2021, the family court granted Mother unsupervised visitation with Child and set a schedule gradually increasing the visitation periods until January of 2022, at which point Mother would begin exercising visitation every other weekend, with overnight visitation on the Thursdays of "off" weekends.  The order also directed Mother not to have romantic partners overnight on nights when she had Child or to allow Child around Brandon Taylor "without Mother or another suitable adult present."[2]

The family court held a three-day TPR hearing from December 7-9, 2022.  Prior to the start of the hearing, DSS withdrew its TPR complaint, and the case moved forward solely on Foster Parents' TPR action.  At the hearing, Mother admitted she had used drugs intermittently throughout the first DSS case, despite completing her placement plan.  She testified that immediately upon Child's July 2019 removal, she contacted Anderson/Oconee Behavioral Health Services (BHS) and Southwest Carolina Treatment Center (Southwest) but was unable to enroll in the BHS

---

[1] 400 U.S. 25 (1970).

[2] Although the exact nature of Mother's relationship with Taylor is disputed, Mother acknowledged Taylor initially believed he was Child's biological father, and Child had Taylor's last name.  She also lived at Taylor's home half of the time and used his address for mailing and school zoning purposes.

program until November of 2019; her November 2019 BHS assessment records indicated she was still using heroin, marijuana, and opiates daily at that point. She also continued to test positive for marijuana on urine screens until March of 2020; however, Crystal Garner, the foster care program coordinator for Anderson County DSS and Child's foster care supervisor, asserted that Mother's decreasing levels leading up to March of 2020 "indicate[d] no new usage," and Mother, without objection, testified her counselor stated the drug would take at least four months to leave her body due to her methadone usage and fluctuation in weight.

Mother completed substance abuse treatment in July of 2020, and at the time of the TPR hearing, she continued to receive methadone treatment at Southwest. She testified that at the time of the hearing, she went to Southwest twice per month and received approximately thirteen methadone pills, and she asserted she received approval for meetings with her Southwest counselor to fulfill her individual counseling requirement.[3] Four DSS employees testified at the TPR hearing; all but one—Shatori Simpson, the case worker from November 2019 until September 2020—testified Mother's continued methadone treatment did not preclude her from completing her placement plan, and Simpson acknowledged she had previous cases in which individuals receiving methadone had children returned to their care. Floy Kenyon, the GAL for the TPR action, testified Mother expressed to her in November of 2020 that she planned to stop receiving methadone within one year, and Mother acknowledged the need for a plan to taper off of the drug. One of the DSS case managers testified she believed Mother was on the lowest dose of methadone, but no other evidence was presented regarding Mother's dosage, her treatment plan, or general information regarding long-term methadone treatment. Garner testified she had spoken "extensive[ly]" with Mother's Southwest counselor and had no concerns about Mother continuing to receive methadone treatment.

Mother testified she and Taylor were not engaged in a romantic relationship, but she acknowledged Child shared Taylor's last name, she lived with him half of the time, and he assisted her with various tasks such as dropping Sibling off at school and picking her up. All of the DSS employees testified Mother had maintained suitable and independent housing per the court-ordered placement plan, but Simpson testified that Mother's residing with Taylor, who had a criminal background that included a felony drug conviction and a violation of a 2015 order

---

[3] Hannah McCain, the DSS case manager from October of 2020 until November of 2021, confirmed Mother's Southwest counselor, who administered her methadone treatment, was not licensed to provide individual counseling. She could not recall whether she or her supervisor authorized him to do so.

of protection in an unrelated case, did not comply with the placement plan's bar on residing with anyone with an "unsafe criminal background as determined by DSS." Garner, however, testified that Taylor's criminal record was not a concern and confirmed that she spoke for DSS on the issue. Garner explained Taylor allowed DSS access to his home, submitted to drug screens, and had not participated in recent criminal activity. Although the GAL believed Mother's relationship with Taylor was "codependent in nature," Mother denied receiving any financial assistance outside of government benefits.[4] Garner and Deanna Luvene, Mother's expert in bonding and trauma therapy who treated Child from April 2021 until July 2022, did not believe Mother was dependent on Taylor.

DSS's position at the TPR hearing was that Mother had completed her placement plan and made her home safe for Child's return. Although the testimony was inconsistent regarding when DSS changed its internal plan to reunification, in January of 2022, the agency requested the family court change the official plan to reunification.

In its final order, the family court found clear and convincing evidence showed (1) Mother failed to remedy the conditions that caused Child's removal and (2) Child had been in foster care for fifteen out of the previous twenty-two months. In particular, the court found Mother's representation of her relationship with Taylor was deceptive, and Child had languished in foster care due to Mother's drug abuse and codependence on Taylor. The court also found TPR was in Child's best interest. This appeal followed.

On appeal from the family court, this court reviews factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). Under the de novo standard of review, this court may make its own findings of fact; however, we continue to recognize the superior position of the family court to assess witness credibility. *Stoney v. Stoney*, 422 S.C. 593, 595, 813 S.E.2d 486, 487 (2018). De novo review does not relieve the appellant of the

---

[4] Mother worked three days per week at Ingles supermarket and reported year-to-date earnings of just under $7,000 as of November 2022, close to $3,000 of which was diverted to pay child support. She supplemented her income by donating plasma and stated she was able to work full-time, but her work schedule at the time of the hearing accommodated Child's weekend visitations. Mother received government assistance for housing and food and confirmed that her rent amount, which was calculated based on her reported income, had been zero for several months.

burden of showing that the preponderance of the evidence is against the family court's findings. *Id.*

The family court may order TPR upon finding a statutory ground for TPR is met and TPR is in the child's best interest. S.C. Code Ann. § 63-7-2570 (Supp. 2023). The grounds for TPR must be proved by clear and convincing evidence. *S.C. Dep't of Soc. Servs. v. Parker*, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct. App. 1999). "Clear and convincing evidence is that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established." *Loe v. Mother, Father, & Berkeley Cnty. Dep't of Soc. Servs.*, 382 S.C. 457, 465, 675 S.E.2d 807, 811 (Ct. App. 2009) (quoting *Anonymous (M–156–90) v. State Bd. of Med. Exam'rs*, 329 S.C. 371, 374 n.2, 496 S.E.2d 17, 18 n.2 (1998)). A statutory ground for TPR is met when a child "has been removed from the parent . . . and has been out of the home for a period of six months following the adoption of a placement plan . . . and the parent has not remedied the conditions which caused the removal." § 63-7-2570(2). Another statutory ground for TPR is satisfied when "[t]he child has been in foster care under the responsibility of the State for fifteen of the most recent twenty-two months." § 63-7-2570(8). We hold clear and convincing evidence did not support either statutory ground for TPR.

First, we hold clear and convincing evidence did not show Mother failed to remedy the conditions that caused Child's removal. Uncontroverted evidence showed that Child re-entered foster care in July of 2019 after testing positive for heroin and marijuana. In July 2020, the family court ordered Mother to complete a drug assessment; maintain verifiable income to provide for Child's basic needs; attend individual counseling; maintain safe and independent housing, including not residing "with anyone that has an unsafe criminal background as determined by DSS"; and demonstrate self-sufficiency and recognize the negative effects of codependent relationships on herself and Child. There was no disagreement that Mother completed substance abuse treatment in July of 2020 and last tested positive for illegal substances in March of 2020—three months before she was ordered to complete a placement plan. Moreover, Simpson, who asserted Mother's methadone use indicated she had not remained drug-free, nevertheless acknowledged she had previous clients who had children returned to their care while receiving methadone. Garner, who had had "extensive" talks with Mother's counselor at Southwest, had no concerns regarding Mother's continued receipt of methadone treatment, and another DSS employee stated Mother received the lowest dose of methadone. Although we are concerned that at the time of the TPR hearing, Mother had been receiving methadone treatment for three years despite

her purported intent to cease treatment in the future, Mother was receiving methadone as part of a DSS-sanctioned treatment method, and the record on appeal contains no information regarding Mother's specific methadone treatment plan or evidence that receiving the treatment would interfere with her ability to parent Child. Thus, the evidence indicates Mother remedied the specific condition—Mother's drug use—that caused Child's removal.

Moreover, we find the evidence did not show Mother failed to complete her placement plan due to her relationship with Taylor and limited income. Initially, we note that Garner, who purported to speak for DSS on the issue, did not believe Mother living with Taylor violated the placement plan's prohibition on residing with an individual with an "unsafe criminal background *as determined by DSS*" (emphasis added). As to whether Mother's relationship with Taylor was incompatible with the placement plan's directive that she understand the impact of codependent relationships, we acknowledge the family court, who was in a better position to assess Mother's credibility, found her representation of her relationship with Taylor was deceptive. *See Stoney*, 422 S.C. at 595, 813 S.E.2d at 487 (recognizing the superior position of the family court to assess witness credibility). Additionally, although whether that relationship was romantic in nature is unclear—and Taylor's initial belief that he was Child's biological father suggests it was romantic at some point—the evidence *was* clear that Mother lived at least 50% of the time at Taylor's home, used his address for Sibling's school zone, and listed his home as her mailing address. However, although the GAL believed Mother's relationship with Taylor was codependent, Garner and Luvene did not. Mother denied receiving financial assistance other than government benefits, and although we note she reported year-to-date earnings of just under $7,000 and donated plasma to supplement her income, from that amount, she managed to pay almost $3,000 in child support during that time. She also testified she was able to work full-time, but her work schedule at the time of the hearing accommodated Child's weekend visitations. We are concerned that Mother's living situation may not be the most stable, but we are hesitant to find that her living arrangements and limited earnings precluded her from independently caring for Child, particularly in light of the fact that at the time of the TPR hearing, she had been caring for Sibling for eighteen months with no apparent issues. Accordingly, we hold clear and convincing evidence did not show Mother failed to remedy the conditions that caused Child's removal.

Second, we hold clear and convincing evidence did not support TPR on the statutory ground that Child had been in foster care for fifteen of the previous twenty-two months. It is undisputed that at the time of the TPR hearing, Child had

been in foster care for well over three years, which clearly meets a strict interpretation of this statutory ground. However, our supreme court has instructed that more than the mere passage of time is necessary to terminate an individual's parental rights. *See S.C. Dep't of Soc. Servs. v. Sarah W.*, 402 S.C. 324, 336, 741 S.E.2d 739, 746 (2013) ("[S]ection 63-7-2570(8) may not be used to sever parental rights based solely on the fact that the child has spent fifteen of the past twenty-two months in foster care."); *id.* ("The family court must find . . . the delay in reunification of the family unit is attributable not to mistakes by the government, but to the parent's inability to provide an environment where the child will be nourished and protected."). The evidence showed Mother made significant and sustained progress in completing her treatment services and making her home safe for Child's return. She testified that immediately after Child's removal in July 2019, she contacted BHS and Southwest. Her BHS records indicate she was using heroin, opiates, and marijuana daily in November of 2019; however, she had not tested positive for illegal substances since March of 2020. A merits removal hearing was continued in February of 2020 due to insufficient court time, and by the time Mother was ordered to complete a placement plan in July of 2020, she had completed substance abuse treatment. Moreover, in April of 2021, the family court approved Child's return to Mother and found Mother had complied with her placement plan, although it stated that "an additional period of services [or] supervision" was needed. Additionally, in October of 2021, the family court granted Mother unsupervised visitation that culminated in weekend visitation every other weekend. Finally, although the official permanent plan for Child remained reunification concurrent with TPR, DSS requested the family court change the plan to reunification in January of 2022—almost an entire year before the TPR hearing. Given the totality of the evidence presented, we cannot say that clear and convincing evidence supported the family court's finding that Mother caused the delay in reunification. Accordingly, we hold this statutory ground was not met.

Because we find the record presented to this court does not contain clear and convincing evidence of a statutory ground for TPR, we decline to analyze whether TPR was in Child's best interest. We acknowledge, however, that at the time of the TPR hearing, Child had lived with her foster family for more than four and a half years—all of her life, with the exception of the three weeks she spent in Mother's care in 2019. Accordingly, we reverse the termination of Mother's parental rights and remand for a new permanency planning hearing, to be heard as expeditiously as possible. Pending the permanency planning hearing, the currently existing status quo shall be maintained; however, any party may file a motion concerning

custody of Child during the pendency of the action. Further, our disposition is without prejudice to any party seeking relief in the best interest of the minor child.[5]

**REVERSED AND REMANDED.**[6]

**GEATHERS, HEWITT, and VINSON, JJ., concur.**

---

[5] Mother also argued the family court erred in soliciting Kenyon's recommendation without finding extraordinary circumstances existed and in relying on Kenyon's opinion because she was not qualified as an expert. We find this issue is not preserved for appellate review because Mother did not object to Kenyon's testimony on either basis. *See Payne v. Payne*, 382 S.C. 62, 70, 674 S.E.2d 515, 519 (Ct. App. 2009) (finding any error regarding the GAL's recommendation was not preserved for appellate review when the mother did not object to the recommendation at trial).

[6] We decide this case without oral argument pursuant to Rule 215, SCACR.